***REDACTED VERSION***
***For Public Distribution***

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| ADVANCED SYSTEMS DEVELOPMENT, INC., | ) | |
| Plaintiff, | ) | |
| v. | ) | No. 06-484C |
| | ) | (Judge Baskir) |
| THE UNITED STATES, | ) | |
| Defendant, | ) | |
| and | ) | |
| KENROB IT SOLUTIONS, INC., | ) | |
| Intervenor. | ) | |

**DEFENDANT'S OPPOSITION TO**
**PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

Pursuant to Rule 7 of the Court's Rules and the scheduling order, defendant, the United States, respectfully opposes plaintiff's motion for preliminary injunction. We rely upon the complaint, the administrative record, the following brief, and attached exhibits.[1] We respectfully reserve

[1] "Compl." refers to the Complaint For Injunctive And Declaratory Relief. "Pl. Mem." refers to Plaintiff's Memorandum Of Law In Support Of Plaintiff's Motion For Preliminary Injunction. "AR" refers to the Administrative Record. "Exh." refers to the Exhibits attached to this brief. We object to plaintiff's affidavit and exhibits to the extent that they exceed the administrative record except to the extent they pertain to plaintiff's claims of irreparable harm and balance of harms. See Rules of the United

***REDACTED VERSION***
***For Public Distribution***

the right to address the merits of plaintiff's complaint, should this case proceed beyond the preliminary injunctive stage.

## STATEMENT OF THE ISSUES

1. Whether the Washington Headquarters Service Director's written findings that override of the automatic stay is in the best interest of the United States is rational and supported by the record.

2. Whether enjoining the Washington Headquarters Service from exercising its right to override the automatic stay is warranted when plaintiff will not suffer irreparable harm and the balance of harms favors the Government.

## STATEMENT OF THE CASE

The Washington Headquarters Service ("WHS") is a field activity of the Department of Defense ("DoD") that operates and maintains the Pentagon and provides a variety of services to the Secretary of Defense. AR at 2282. WHS is organized into eleven directorates along functional lines. Id. In the past, each WHS directorate was responsible for its own information technology ("IT") support and has done so through separate

---

States Court of Federal Claims ("RCFC") 52.1.

***REDACTED VERSION***
***For Public Distribution***

contracts each supporting a single directorate. AR at 335. In June 2004, a new organization, the Information Management Technology Directorate ("ITMD"), was formed with the responsibility of providing all IT support to WHS in a consolidated enterprise approach. Id.

Prior to the contract award at issue in this case, IT services were being provided by five contractors performing six separate contracts. AR at 2282. ASD was one of these contractors. Compl. ¶ 2. The multiple contractor arrangement posed many Pentagon and DoD agency problems and inefficiencies, including the inability to maintain single configuration management of hardware and software, paying for redundant skill sets across multiple contractors for similar IT support services, lack of knowledge management within the IT support teams, and limited ability to modernize to meet the new challenges of the organization. Exh. A ¶ 6.

On March 9, 2006, WHS issued Solicitation No. HQ0034-06-R-1012 seeking consolidated IT support services. AR at 191. The solicitation contemplated that a single contract would be awarded to a contractor who would be responsible for providing the full range of enterprise and domain IT solutions. AR at 335. The solicitation stated that a contract would be

***REDACTED VERSION***
***For Public Distribution***

awarded to the offeror whose proposal offers the best overall value to the Government. AR at 266. The solicitation listed evaluation factors that would be considered and the relative importance of those factors. AR at 266-72.

On April 12, 2006, plaintiff, Advanced Systems Development Inc. ("ASD"), and intervenor, KENROB IT Solutions Inc. ("KENROB"), along with three other contractors, submitted proposals in response to the solicitation. AR at 627, 1083. Based upon the Proposal Evaluation Board's ("PEB") evaluation of the proposals, the Source Selection Authority ("SSA") determined that [redacted] were in the competitive range and authorized the contracting officer ("CO") to hold written discussions with them. AR at 1557. Upon written discussions, on May 17, 2006, [redacted] submitted final proposals. AR at 1564,1707. On May 22, 2006, the SSA issued its decision finding that KENROB's proposal represented the best value to the Government. AR at 1997. The SSA issued her decision without knowledge of the identity of any of the offerors. AR at 1980.

On June 5, 2006, WHS awarded the contract to KENROB. AR at

***REDACTED VERSION***
***For Public Distribution***

1998. On June 7, 2006, ASD requested a debriefing, and a debriefing was provided two days later. AR at 2001-02. On June 14, 2006, ASD filed a protest before the Government Accountability Office ("GAO") challenging WHS' evaluation of the proposals. AR at 2161-69, 2172-85. ASD also alleged that WHS failed to conduct meaningful discussions with ASD regarding its price proposal. AR at 2170-72.

On June 21, 2006, the Director of WHS issued a "Determination and Findings To Proceed With Contract Performance" ("D&F"). AR at 2282. The D&F explained that the override of the automatic stay pursuant to 31 U.S.C. § 3553 was in the "best interest of the United States," because WHS was suffering from several problems due to its fragmented, multiple contractor IT system. Id. The WHS Director explained that, prior to award, WHS had six separate IT support contracts, and that this "decentralized approach . . . resulted in substantial duplication of costs and made resolving network problems needlessly cumbersome and time consuming . . . [and] frustrated attempts to develop a single agency-wide hardware and software architecture." Id.

The WHS Director further explained that a "single IT support

***REDACTED VERSION***
***For Public Distribution***

contractor will permit WHS to develop a single, cohesive network architecture that eliminates redundant functions, takes advantage of economies of scale, reduces overhead costs and will permit WHS to reduce recurring operation and maintenance costs significantly." Id. The WHS Director believed that it was "of paramount importance" to consolidate its IT contracts as soon as possible "in an era of steadily declining IT budgets." Id. The WHS Director further believed that it was in the public interest to continue with contract performance because the WHS network supports more than 2500 end users at the Pentagon, including those responsible for critical building operations at the Pentagon, DoD's payment office, and the Office of the Secretary of Defense. AR at 2283.

On July 5, 2006, the WHS Director issued Supplemental Findings concerning the stay override. The Director stated that he considered the potential transition and termination for convenience costs should ASD's protest be sustained and ASD win the re-evaluation. Exh. B ¶¶ 5, 6. The Director concluded that the "costs savings and enhanced performance through continued contract performance, however, still outweigh the re-transition and potential termination for convenience costs." Ex. B ¶ 6. The

***REDACTED VERSION***
***For Public Distribution***

WHS Director further stated that the WHS' IT budget for the current fiscal year was unexpectedly reduced by [redacted]. Exh. B ¶ 7. "If WHS is required to provide IT support services under the incumbent contracts without reaping the cost savings and enhanced performance under the consolidated program, there will be no funds available to continue under the multiple contract status quo. The multiple contracts will have to be de-scoped dramatically, which will result in significantly degraded service to WHS' customers." Exh. B ¶ 7.

On June 26, 2006, ASD filed a protest in the Court of Federal Claims challenging only the WHS determination to override the automatic stay. Compl. ¶ 1. ASD does not challenge the underlying merits of the protested award in this action. Id. ASD seeks injunctive relief enjoining WHS from proceeding with contract performance. Id.

## SUMMARY OF ARGUMENT

WHS Director's determination to override the automatic stay triggered by ASD filing a bid protest before the GAO was rational and consistent with common sense. The protested contract involves IT support services to the Secretary of Defense and other Defense agencies located in the Pentagon.

***REDACTED VERSION***
***For Public Distribution***

The current multiple contractor IT system is inefficient, costly, and impairs overall IT reliability. The consolidated, single contractor system is estimated by the Government to save [redacted] per month and will vastly improve services to the end-users. Cost savings will arise from streamlining resources and eliminating redundancies, which include 33 percent of the contractor positions required to support WHS' IT system. Under current budget constraints, WHS cannot continue with the multiple contracts status quo and will be forced to de-scope the contracts and significantly curtail certain IT support services. This will severely degrade the IT systems at the Pentagon and negative impact WHS' ability to meet its mission. Accordingly, WHS Director's rationale is reasonable and supported by the administrative record and the attached declaration of ITMD's Deputy Director. The Court should defer to WHS Director's "best interest" determination.

The Court, further, should reject ASD's motion to enjoin contract performance because ASD has failed to demonstrate any irreparable harm. ASD contends that it will be irreparably harmed if KENROB is permitted to perform the new contract because it will be unable to obtain full relief

***REDACTED VERSION***
***For Public Distribution***

before the GAO. This argument is without any merit, as 38 U.S.C. § 3554(b)(2) provides that the GAO should grant relief without any regard to any cost or disruption from terminating, re-competing or re-awarding the contract when the agency head makes a "best interest" determination and continues with contract performance.

ASD further asserts that it will be competitively disadvantaged if KENROB is allowed to perform the contract because KENROB will gain knowledge and expertise of WHS' IT system during this period and can revise its technical proposal. ASD's argument, again, is without any merit. First, ASD [redacted]; thus, any knowledge or experience that KENROB will gain will only level the playing field. Second, KENROB will not have an opportunity to revise its technical proposal. If the protest is sustained, the appropriate relief is re-evaluation of ASD's and KENROB's existing proposals, not re-competition of the contract. This is because ASD's protest primarily alleges that WHS improperly evaluated the proposals, which can be remedied by a re-evaluation.

ASD also asserts that it will suffer irreparable harm because it will be

***REDACTED VERSION***
***For Public Distribution***

more costly to transition into the new contract after KENROB has begun contract performance. ASD's unsupported assertion is false. Contrary to ASD's assertion, [redacted]. In any event, if ASD does incur increased costs as a result of KENROB continuing contract performance, ASD may recover those costs pursuant to the Changes Clause in the contract.

ASD finally asserts that it will suffer irreparable harm because KENROB will hire away its employee during the protest period. ASD's assertion again is false. Based upon its [redacted], there is no reason to believe that ASD will suffer a major loss of its employees. Even if ASD loses some of its employees, ASD may hire back any employees that joined KENROB or recruit additional employees from the general labor market. Any additional costs that ASD may incur in hiring additional employees constitutes mere economic loss and does not constitute irreparable harm.

***REDACTED VERSION***
***For Public Distribution***

In summary, an injunction is not warranted because the balance of harms favors the Government. There is no evidence that ASD will suffer irreparable harm. In contrast, any delay in contract performance will cost the Government [redacted] per month. Exh. A ¶ 9. A four or six month delay, thus, could cost the Government between [redacted]. Moreover, due to severe budget cuts and because WHS has already budgeted these cost savings into its budget, enjoining the consolidated contract will require WHS to de-scope the existing contracts, resulting in substantially less service to WHS and degraded IT performance. Continuing contract performance is in the best interest of the public because the WHS' IT system serves more than 2500 users in the Pentagon, including those responsible for critical building operations at the Pentagon, DoD's payment office, and the office of the Secretary of Defense. Any compromise in service will affect these end users and compromise DoD's ability to accomplish its mission.

## ARGUMENT

***REDACTED VERSION***
***For Public Distribution***

I. Standard Of Review

In order to obtain a preliminary injunction, plaintiff must demonstrate that: (1) the movant is likely to succeed on the merits, (2) that it will suffer irreparable harm if preliminary relief is not granted, (3) that the balance of hardships tips in the movant's favor, and (4) that a preliminary injunction will not be contrary to the public interest. FMC Corp. v. United States, 3 F.3d 424, 427 (Fed. Cir. 1993); accord Chapman Law Firm v. United States, 67 Fed. Cl. 188, 190 (2005). "[N]o one factor, taken individually, is necessarily dispositive . . . [T]he weakness of the showing regarding one factor may be overborne by the strength of the others." Id.

This Court reviews challenges to Government procurements pursuant to the standards set forth in the Administrative Procedures Act ("APA"), 5 U.S.C. §§ 701-706. 28 U.S.C. § 1491(b)(4). Under the APA, the reviewing court may overturn an agency action if the court finds that it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Agency action is arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem,

***REDACTED VERSION***
***For Public Distribution***

offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise. Motor Vehicle Mfrs. Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983).

## II. The WHS Director's Written Findings That The Override Is In The Best Interest Of the Government Is Rational And Supported By The Record

The Competition in Contracting Act ("CICA") of 1984, 31 U.S.C. § 3553, enacted into law an automatic stay provision, which prevents a Federal agency from awarding a contract or continuing with contract performance, when a contractor timely files a protest with the General Accountability Office ("GAO"). Congress intended the automatic stay provision to act as an enforcement mechanism to ensure that competition is being enforced. PGBA, LLC v. United States, 57 Fed. Cl. 657-58 (2003) (discussing legislative history).

Despite Congress' concern for competition in public procurements, it is important to realize that Congress did not enact into law an absolute stay provision. Instead, Congress authorized the head of an agency to override

***REDACTED VERSION***
***For Public Distribution***

the automatic stay under certain circumstances. Prior to contract award, the head of agency must issue a "written finding that urgent and compelling circumstances which significantly affect interests of the United States will not permit waiting for the decision of the Comptroller General." 31 U.S.C. 3553(c)(2)(A). In contrast, after contract award, the head of an agency can issue a "written finding that (I) performance of the contract is in the best interest of the United States; <u>or</u> (II) urgent and compelling circumstances that significantly affect interests of the United States will not permit waiting for the decision of the Comptroller General concerning the protest." 31 U.S.C. § 3553(d)(3)(c) (emphasis added).

The Court in <u>Spherix, Inc. v. United States</u>, 62 Fed. Cl. 497, 504 (Fed. Cl. 2004), noticed this important distinction. Whereas prior to contract award, Congress imposed the more difficult standard of "urgent and compelling circumstances," this Court stated that after contract award, "Congress charted an <u>easy</u> course for an agency override." <u>Spherix</u>, 62 Fed. Cl. at 505 (emphasis added). "Failing the ability to show that urgent and compelling circumstances justify the override, the agency head can elect to make the <u>unremarkable</u> determination that contract performance is

***REDACTED VERSION***
***For Public Distribution***

in the best interests of the United States." Id. (emphasis added). Because of this "minimal standard," the Court noted that plaintiff's ability to succeed on the merits, i.e., demonstrate that the agency head's written finding was arbitrary or capricious, faced an "uphill battle." Id.

In Spherix, under this deferential standard, the Court easily determined that the agency head's "public interest" finding was reasonable. In that case, the Forest Service Chief explained that it was in the Government's best interest to continue with contract performance because the new contract for a consolidated reservation system would be more efficient and provide an improved "one-stop" reservation service. 62 Fed. Cl. at 500. The Chief further explained that any delay would cause the agency to miss its "go-live" date, which would jeopardize its ability to implement the new system by the busy reservation season. Id. The Court found the Chief's written finding presented a rational basis for its decision to move forward with contract performance. Id. at 506.

Similarly, in Sierra Military Health Serv., Inc. v. United States, 58 Fed. Cl. 573 (2003), the Court determined that the agency head's written finding that override was in the best interest of the United States was reasonable

***REDACTED VERSION***
***For Public Distribution***

under the circumstances. In Sierra Military, the procurement involved the Government's effort to transform and consolidate the military health system, from eleven geographical regions to three, and from seven contracts to three. 58 Fed. Cl. at 575. The agency's head authorized override of the automatic stay based upon three grounds: (1) the operational impact on the effective and efficient administration of the military health care system, (2) the effect on the beneficiaries of the system, and (3) the cost impact to the Government of the continued suspension of contract performance. Id. at 576. The Court found these findings reasonable and supported by the record. See also Chapman Law Firm, 67 Fed. Cl. at 191-93 (holding agency head's "public interest" finding reasonable based in part on concerns about the "public fisc"); Alion Science and Tech. Group v. United States, 69 Fed. Cl. 14, 25-32 (2005) (same); SDS Int'l, Inc. v. United States, 55 Fed. Cl. 363 (2003) (same).

Here, as in Spherix and Sierra Military, the WHS Director's decision that the override was in the "best interest of the United States" is reasonable and supported by the administrative record. As the Director explained, "[p]rior to award, WHS had six separate IT support contracts."

***REDACTED VERSION***
***For Public Distribution***

AR at 2282. Five separate contractors were operating six separate help desks and four separate e-mail systems. Id. This not only resulted in "substantial duplication of costs," but also "made resolving network problems needlessly cumbersome and time consuming." Id. It was imperative for WHS to "develop a single, cohesive network architecture that eliminates redundant functions, takes advantage of economies of scale, reduces overhead costs and will permit WHS to reduce recurring operation and maintenance costs significantly." Id.

Indeed, the Acquisition Plan for the new IT contract supports the WHS Director's written determinations and findings. The Plan explained that based upon the results of market research, WHS determined that consolidating IT requirements into a single-integrated contract will provide substantial benefits to the Government. AR at 136. WHS estimated that the consolidated contract would cost [redacted] per year. AR at 134.

> The estimate was prepared conducting a cross-walk of the labor categories in the historic (current) contracts mapped to the new level of services outlined in the proposed environment. Like functions were evaluated against like categories and redundancies were assessed for potential overlap and/or elimination against proposed environment estimates.

***REDACTED VERSION***
***For Public Distribution***

Id. "ITMD analysis indicate[d] that the expected dollar savings in consolidating this contract will be [redacted] of the total value of all applicable IT contracts that currently support WHS." AR at 136. "The majority of these cost-related benefits will be derived from elimination of redundant services being experienced on the current 'stove-piped' contract environment where each organization issues their own separate IT support contract." Id.

WHS Director's written determinations and findings are further supported by the attached declaration of Robert Cox, ITMD's Deputy Director. Exh. A. He has personal knowledge of the multiple contractor arrangement as he was directly involved in the evaluation and planning for all IT services. Exh. A ¶ 4. He states in his declaration that the "current multiple contract/contractor arrangement for performing WHS IT support services poses many Pentagon- and DoD-wide IT problems and inefficiencies," including: (1) inability to maintain a single configuration management of WHS' IT environment (software, hardware, firmware); (2) paying for redundant skill sets across multiple contractors for similar IT support services, (3) lack of knowledge management within the IT support

***REDACTED VERSION***
***For Public Distribution***

teams, and (4) limited ability to modernize to meet the new challenges of the organization. Exh. A ¶ 6. He further explains in his declaration that all of these problems posed by the multiple contractor program "negatively impact overall IT system reliability at the Pentagon," because operation of its IT system is "compromised by the least effective, least efficient support contractor." Exh. A ¶ 7.

Mr. Cox estimates that WHS will save [redacted] a month under a consolidated, single-contractor approach. Exh. A ¶ 9. The cost savings are due to the "[c]onsolidation of common IT infrastructures and management tools across the six separate contracts." Exh. A ¶ 10A. For example, areas of consolidation include server farm management, software maintenance, and asset management. Id. Further, cost savings arise from eliminating [redacted], which represents a reduction of one-third of the total contractor positions required to support WHS' IT system. Exh. A ¶ 10B.

Mr. Cox further explains that these cost savings have already been incorporated into WHS' IT budget, and further that, due to increased

***REDACTED VERSION***
***For Public Distribution***

military operations, WHS recently suffered an unforecasted [redacted] reduction of its IT budget. Exh. A ¶¶ 11, 12. As a result, without the anticipated costs savings of the consolidated contract, WHS will be required to significantly reduce the scope of its existing contracts. Exh. B ¶ 12. "The impact to WHS and its customers would be severe. All key WHS business areas would be impacted, which would directly impact the organization's ability to provide administrative and operational services to its clients in support of the Department of Defense." Id. For example, the Pentagon would lose its ability to effectively track goods and deliveries that enter and exit the facility, effectively maintain the Pentagon facility, effectively recruit, retain and pay personnel, and effectively monitor external correspondence. Exh. B ¶ 13.

ASD does not dispute the significant benefits to the Government reaped by implementing the consolidated IT support services program. It its proposal, ASD stated:

> [redacted],
> [redacted],

***REDACTED VERSION***
***For Public Distribution***

[redacted].

AR at 1090 (emphasis added). Rather than challenge the factual underpinning for the stay override, ASD contends that the override is improper because agency assertions that the new contract is better than the old as a basis to override the stay have been rejected by this Court. Pl. Mem. at 21-22. Contrary to ASD's contention, however, this Court in Spherix and Sierra Military, have upheld a stay override where the new contract provides greater efficiency, reliability and cost savings to the Government due to consolidation of its prior contracts.

Even the CIGNA case cited by ASD recognizes that cost savings are a legitimate reason to override the stay. In that case, the Court addressed the "newer, better" contract argument separate from the alleged cost savings as a basis to override the stay. CIGNA Gov't Services, LLC v. United States, 70 Fed. Cl. 100, 113-14 (2005). The Court found that the agency's alleged cost savings were not supported by the record and, therefore, insufficient to justify the override. Id. Here, there is no dispute that the Government will reap real cost savings as a result of streamlining resources, eliminating redundancies, and economies of scale.

***REDACTED VERSION***
***For Public Distribution***

Further, the Court in CIGNA and PGBA were primarily concerned about the fact that the agency's rationale for the override was contradicted by or unsupported by evidence in the record. For example, in CIGNA, the agency's justification that its procurement was on a tight schedule was belied by contrary assertions that the agency made to Congress. 70 Fed. Cl. at 111. Similarly, in PGBA, the Court found that the agency's "critical" assumption concerning the impact of delayed performance under the awarded contract were wholly unsupported by the record and that the "nakedness" of the assumption "undercut other critical findings made by the Director." 57 Fed. Cl. at 660-62. Here, as we demonstrated, the facts supporting WHS' override are supported by the record, the attached declaration of Mr. Cox, and indeed admitted by ASD.

ASD further argues that the override was improper because WHS failed to consider alternatives to the override such as extending the incumbent contractor's contracts. Pl. Mem. at 23-24. That argument "begs the question" because it ignores the fact that extending the multiple contracts prolongs the harm that WHS seeks to avoid, namely continuing a costly, inefficient, and less reliable IT support program. By overriding the

***REDACTED VERSION***
***For Public Distribution***

stay, WHS decided that continuing with the incumbent contracts was not in the nation's interests and that the Government was best served by implementing the consolidation program immediately.

Further, continuing with the multiple contract IT support program is not a viable alternative. Due to budget constraints, WHS cannot continue with the multiple contracts program pending the GAO protest and maintain the same level of IT support services in the new contract. Exh. A ¶ 11-13. Instead, without the override, WHS will be required to curtail its IT support activities and significantly decrease the available IT support services. Id. In his Supplemental Findings, WHS Director has considered the impact that service cutbacks necessitated by continuing the multiple contract regime will have on IT systems at the Pentagon and concluded that the degradation in services justifies the override. Exh. B ¶ 7.

Finally, ASD asserts that WHS should have considered the costs to terminate KENROB's contract for convenience should its protest be sustained and ASD prevail in the re-evaluation. Pl. Mem. at 24-26. Those termination costs have now been considered by WHS, and weighing the costs and inefficiencies associated with continuing under the incumbent

***REDACTED VERSION***
***For Public Distribution***

regime against the termination costs that might be due KENROB should ASD's protest be sustained and ASD win the re-evaluation, WHS has concluded that the nation is best served by continuing to override the stay. See Supplemental Determination and Findings, attached as Exhibit B. Accordingly, the Government respectfully submits that the stay override is proper and well supported by the record. Because ASD is unlikely to prevail on the merits, the Court should deny ASD's motion for a preliminary injunction.

III. ASD Is Not Prejudiced By The Stay Override

ASD contends that it will suffer irreparable harm if the override is not enjoined. Pl. Mem. at 29. ASD first asserts that allowing contract performance will cause ASD irreparable harm by lessening its chance of obtaining full relief at the GAO. Id. at 30. This unsupported assertion is patently erroneous. 38 U.S.C. § 3554(b)(2) provides that the GAO should grant the protestor the appropriate relief "without regard to any cost or disruption from terminating, recompeting, or reawarding the contract," when the agency head overrides the automatic stay in the "best interest of the United States."

***REDACTED VERSION***
***For Public Distribution***

ASD further asserts that it will suffer irreparable harm in the form of a competitive disadvantage if KENROB is allowed to perform the contract. Pl. Mem. at 31. ASD believes that the knowledge that KENROB will gain from performing during the protest period and its ability to adjust and fine-tune its proposal during this time will competitively disadvantage ASD. Id. ASD's assertion is without any merit. First, any knowledge or experience KENROB gains during the protest period will only level the playing field. ASD is the incumbent contractor [redacted]. ASD [redacted]. Allowing KENROB to continue contract performance pending the GAO protest, thus, will not competitively disadvantage ASD.

Moreover, ASD's assertion is based on the false assumption that the GAO will recompete the contract and, therefore, KENROB will have an opportunity to revise its proposal. Pl. Mem. at 31. Even if ASD's protest is sustained by the GAO, the GAO will not likely recompete the contract, but rather, more appropriately require WHS to re-evaluate the existing [redacted]

***REDACTED VERSION***
***For Public Distribution***

[redacted]. This is because ASD's protest generally involved the manner in which WHS evaluated the proposals. Pl. Mem. at 13-14; Complaint ¶ 10.

The only protest ground that did not involve the manner in which WHS evaluated the proposals, is ASD's contention that WHS failed to conduct meaningful discussions with ASD regarding its price proposal. Specifically, ASD contends that [redacted]. AR at 2171-72. If this protest ground is sustained, however, ASD would be allowed to revise only its price proposal. If afforded the opportunity to do so, ASD will have a competitive advantage because it was already debriefed about the prices proposed by KENROB. AR at 2032.

In addition, ASD asserts that it will be prejudiced should KENROB continue performance and [redacted]

***REDACTED VERSION***
***For Public Distribution***

[redacted]. Pl. Mem. at 32. ASD's naked assertion is unsupported by any evidence. Nor does ASD explain how it will be prejudiced and how it might incur increased costs. Contrary to ASD's assertion, [redacted]. Exh. A ¶ 14. [redacted]. Id. Therefore, there is no prejudice to ASD, competitive or otherwise, if KENROB continues performance during the protest period.

Even if ASD is awarded the contract after a GAO-recommended re-evaluation and [redacted], relief is available under the contract. Pursuant to the Changes Clause in the contract, ASD may submit a change order for additional costs incurred due to any changes in the scope of the contract. AR at 230 (incorporating FAR 52.243-1 Alt. I); AR at 335 ("The WHS user support environment is, however, dynamic and may evolve in the future. Any significant increases or decreases in future support levels will be

***REDACTED VERSION***
***For Public Distribution***

incorporated via the Changes clause and other applicable terms, conditions and requirements of the contract.") Economic loss, such as increased costs due to the change in the scope of work, does not constitute the type of "irreparable harm" that warrants injunctive relief. Sierra Military, 58 Fed. Cl. at 582 ("[E]conomic loss does not, in and of itself, constitute irreparable harm.); accord Chapman Law Firm, 67 Fed. Cl. at 193 ("Normally, an injury is not considered 'irreparable' if the only injury alleged is monetary loss.")

ASD finally asserts that it will suffer irreparable harm because allowing contract performance to continue will enable KENROB to hire away its employees. Pl. Mem. at 32. ASD's assertion, however, is contradicted by the record and its own President's affidavit. The record indicates that ASD received the [redacted] rating for its Human Resources factor based upon [redacted]. AR at 1977, 1979. Mr. Bennett, the President and CEO of ASD, further stated in his affidavit that "[redacted]

***REDACTED VERSION***
***For Public Distribution***

[redacted]." Bennet Affid. ¶ 26. Contrary to ASD's assertion, thus, it appears that ASD will be able to retain its employees [redacted].

Even if ASD does lose some of its employees to KENROB, ASD may hire back those employees if the protest is sustained and ASD wins the re-evaluation. In any event, increased costs incurred as a result of a hiring additional employees, is not the type of "irreparable harm" that warrants injunctive relief. Sierra Military, 58 Fed. Cl. at 582 ("[E]conomic loss does not, in and of itself, constitute irreparable harm."); accord Chapman Law Firm, 67 Fed. Cl. at 193 ("Normally, an injury is not considered 'irreparable' if the only injury alleged is monetary loss.")

In sum, ASD has failed to demonstrate any irreparable harm as a result of the override of the stay. ASD will be able to obtain the full relief before the GAO regardless of whether KENROB continues contract performance. ASD further will not be competitively disadvantaged from KENROB continuing performance because, even if ASD prevails before the GAO, the appropriate relief is re-evaluation of the existing proposals, not

***REDACTED VERSION***
***For Public Distribution***

re-competition of the contract. Further, ASD has failed to demonstrate that it will incur significant transition costs or that it will lose a significant number of its employees if KENROB continues performance. These assertions are unsupported by any evidence and, in fact, are contradicted by evidence in the record. Finally, any additional costs that ASD may incur as a result of KENROB continuing contract performance, such as transition costs or costs in hiring additional employees, constitute mere economic loss that does not rise to the level of irreparable harm.

IV. <u>The Balance Of Hardships Favors The Government</u>

ASD contends that any purported harm to WHS arising from an injunction is minimal because WHS can continue to acquire uninterrupted IT services from its incumbent contractors. Pl. Mem. at 32-33. ASD's contention fails to address the real harm to the Government, which arises from the old, inefficient multiple contractor system. As Mr. Cox's declaration demonstrates, the harm to the Government in terms of additional costs, IT reliability, efficiency and mission accomplishment is real and will cost the Government, in dollar terms, [redacted] per month. Exh. A ¶ 8. The loss of IT reliability and efficiency, although unmeasurable, will

***REDACTED VERSION***
***For Public Distribution***

also harm the end-users of the system at the Pentagon. Exh. A ¶ 7.

ASD further erroneously asserts that the harm to the Government is minimal because the GAO will issue its decision by September 22, 2006. Pl. Mem. at 32. ASD fails to include the time for reevaluation should GAO sustain ASD's protest. It will likely take an additional one to three months after the protest is sustained before WHS is able to re-evaluate the proposals and re-issue award of the contract. The total cost of continuing contract performance, thus, could cost the Government between [redacted]. Exh. A ¶ 9. Furthermore, because WHS IT budget already incorporates the cost savings from the new contract, absent realization of these cost savings by proceeding with contract performance, WHS, without the override, will have to de-scope the incumbent contracts, resulting in substantially less and degraded service to WHS. Exh. A ¶ 11-13. The balance of hardships, therefore, favors the Government.

V. Enjoining The Override Is Contrary To The Public Interest

ASD finally contends that enjoining contract performance is in the public interest because the "public has an overriding interest in preserving the integrity of the procurement process by requiring the government to

***REDACTED VERSION***
***For Public Distribution***

follow its laws and regulations." Pl. Mem. at 33. Although it is true that the public has an interest in preserving the integrity of the procurement process, ASD fails to explain how enjoining contract performance would meet this goal. ASD has filed its protest challenging WHS evaluation of the proposals and the GAO will issue its decision by September 22, 2006. Should the protest be sustained, the GAO will provide the appropriate relief without consideration of any disruption or termination costs as a result contract performance. 31 U.S.C. § 3554(b)(2). ASD thereby will preserve its right to challenge the procurement process without harming the Government by preventing it from transitioning to a more efficient and cost-effective single contractor IT system.

Contrary to ASD's assertions, continuing contract performance will serve the public interest by enabling the Government to receive the benefits of the consolidated contract, while preserving the protestor's right to relief should the protest be sustained. As the Court in Spherix aptly noted, Congress imposed a lower burden upon agency's heads in overriding a stay after contract award because it "recognized the need for continuing performance of awarded contracts." 62 Fed. Cl. at 507.

***REDACTED VERSION***
***For Public Distribution***

"Presumptively, performance of government contracts on schedule always serves the best interests of the United States." Id. at 505. This is true especially here, where the contract was issued so that WHS can streamline resources and eliminate redundant functions caused by five contractors separately providing IT services. It is in the public interest for KENROB to continue contract performance so that it can immediately eliminate redundancies and streamline resources. This will benefit 2500 end-users of the IT system in the Pentagon, including those responsible for the critical building operations at the Pentagon, DoD's payment office, and the Office of the Secretary of Defense, and will improve DoD's ability to accomplish its mission more effectively. AR at 2283.

## CONCLUSION

For the foregoing reasons, we respectfully request that the Court enter final judgment sustaining WHS Director's written determinations and findings overriding the stay and deny plaintiff's motion for preliminary injunction.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

***REDACTED VERSION***
***For Public Distribution***

DAVID M. COHEN
Director

s/ Jeanne E. Davidson

JEANNE E. DAVIDSON
Deputy Director

s/ Nancy M. Kim

NANCY M. KIM
Trial Attorney
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
Attn: Classification Unit, 8th Floor
1100 L Street, N.W.
Washington, D.C. 20530
Tel: (202) 353-0546
Fax: (202) 514-8640

Attorneys for Defendant

OF COUNSEL:

Andrew Bramnick
Assistant General Counsel
Washington Headquarters Service

July 13, 2006