# IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| ADVANCED SYSTEMS DEVELOPMENT, INC., | ) | |
| Plaintiff, | ) | No. 06-484C<br>(Judge Lawrence M. Baskir) |
| v. | ) | |
| THE UNITED STATES, et al. | ) | **AGREED UPON REDACTED VERSION: MAY BE MADE PUBLIC** |
| Defendant, | ) | |
| and | ) | |
| KENROB IT SOLUTIONS, INC., | ) | |
| Intervenor. | ) | |

## PLAINTIFF ADVANCED SYSTEMS DEVELOPMENT, INC.'S REPLY TO THE OPPOSITIONS TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

Dated: July 10, 2006

HOLLAND & KNIGHT LLP

Paul E. Pompeo
2099 Pennsylvania Avenue, N.W.,
Suite 100
Washington, D.C. 20006
(202) 457-7033 – phone
(202) 419-2913 – fax

*Counsel for Advanced Systems Development, Inc.,*

Of Counsel:

Kara L. Daniels
David J. Craig
HOLLAND & KNIGHT LLP

# TABLE OF CONTENTS


I. SUMMARY OF ARGUMENT .......... 1

II. STANDARD OF REVIEW AND THE ADMINISTRATIVE RECORD .......... 2

A. THE COURT OWES NO DEFERENCE TO BEST INTEREST OVERRIDES. .......... 2

B. THE AR DOES NOT SUSTAIN THE CONTEMPORANEOUS RATIONALE IN THE D&F. .......... 5

III. ARGUMENT .......... 9

A. WHS'S JUNE 21, 2006 D&F IS ARBITRARY, CAPRICIOUS, OR OTHERWISE NOT IN ACCORDANCE WITH APPLICABLE LAW. .......... 9

1. WHS Ignored Factors Relevant To The Override Determination. .......... 9

a. WHS Admits It Did Not Consider The Costs Involved If GAO Sustains ASD's Protest. .......... 10

i. The AR Does Not Support WHS's Post-Hoc Monthly Savings Calculation. .......... 11

ii. The AR Does Not Support WHS's Post-Hoc Termination Cost Consideration. .......... 14

2. WHS Did Not Consider Alternative Approaches Utilizing the Incumbent Contractors. .......... 15

3. WHS Did Not Consider the Statutory Mandate Embodied in CICA of Ensuring Competition. .......... 19

4. Assuming, *Arguendo*, That The WHS D&F Considered Each Necessary Aspect Of The Problem (Which It Did Not), The D&F Still Fails Because WHS Relied On Improper Factors It And




**AGREED UPON REDACTED VERSION: MADE BE MADE PUBLIC**

Based Its Decision On Facts Not Supported By The AR. ....................19

a. Prospect of a Newer, Better Contract and Related Anticipated Cost Savings is Not a Valid Override Basis. ....................20

b. WHS's Reduced Budget Rationale Also Fails. ....................26

B. ASD WILL SUFFER IRREPARABLE HARM ABSENT INJUNCTIVE RELIEF. ....................27

1. ASD will be Harmed Irreparably by the Knowledge that KENROB will Gain in Performing the Contract. ....................28

2. ASD Will be Harmed Irreparably Because KENROB [redacted] ....................31

3. ASD will Suffer a Competitive Disadvantage Without Injunctive Relief Because KENROB is Hiring Away ASD's Employees. ....................33

C. ANY PURPORTED HARM TO WHS (AND KENROB) IS MINIMAL AND DOES NOT OUTWEIGH THE HARM TO ASD. ....................34

1. The AR Does Not Support WHS's Purported Harms. ....................34

2. The AR Belies KENROB's Assertion of Harm. ....................35

D. INJUNCTIVE RELIEF IS IN THE PUBLIC'S INTEREST. ....................38

IV. CONCLUSION ....................39

**EXHIBITS**

Second Declaration of Richard L. Bennett ....................Ex. 1

Declaration of [redacted] ....................Ex. 2

Declaration of [redacted] ....................Ex. 3



**AGREED UPON REDACTED VERSION:
MADE BE MADE PUBLIC**

## TABLE OF AUTHORITIES

### FEDERAL CASES

*Alion Sci. & Tech. Corp. v. United States*, 69 Fed. Cl. 14 (2005) ..... 15

*Allentown Mack Sales & Services, Inc. v. NLRB*, 522 U.S. 359 (1998) ..... 6

*Am. Textile Mfrs. Inst., Inc. v. Donovan*, 452 U.S. 490 (1981) ..... 7

*Am. Trucking Ass'ns. Inc. v. Fed. Highway Admin.*, 51 F.3d 405 (4th Cir. 1995) ..... 7

*ATA Def. Indus., Inc. v. United States*, 38 Fed. Cl. 489 (1997) ..... 7

*Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.*, 419 U.S. 218 (1974) ..... 6

*Burlington Truck Lines v. United States*, 371 U.S. 156 (1962) ..... 3

*Camp v. Pitts*, 411 U.S. 138 (1973) ..... 6

*Cardinal Maint. Servs., Inc. v. United States*, 63 Fed. Cl. 98, 111 (2004) ..... 35

**Chapman Law Firm Co. v. United States*, 62 Fed. Cl. 464 (2004) ..... *passim*

*Chapman Law Firm Co. v. United States*, 67 Fed. Cl. 188 ..... 24

**CIGNA Government Servs. LLC v. United States*, 70 Fed. Cl. 100 (2006) ..... *passim*

*Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402 (1971) ..... 2, 6

*CW Gov't Travel, Inc. v. United States*, 61 Fed. Cl. 559 (2004) ..... 27



**AGREED UPON REDACTED VERSION:
MADE BE MADE PUBLIC**

*Motor Vehicles Mnfrs. Ass'n of the United States v. State Farm Ins.*, 463 U.S. 29 (1983): .......... 3

**PGBA LLC v. United States,* 57 Fed. Cl. 655 (2003) .......... *passim*

*SEC v. Chenery Corp.*, 322 U.S. 194 (1947) .......... 3

*Sierra Military Health Servs., Inc. v. United States*, 58 Fed. Cl. 573 (2004) .......... 23

*Spherix, Inc. v. United States*, 62 Fed. Cl. 497 (2004) .......... 21

*Transatlantic Lines LLC v. Strong Vessel Operators*, LLC, 68 Fed. Cl. 48 (2005) .......... 27

*Universal Shipping Co. v. United States*, 652 F.Supp. 668 (D.D.C. 1987) .......... 4

*University Research Co., LLC v. United States*, 65 Fed. Cl. 500 (2005) .......... 20

**GAO DECISIONS**

*DTH Mgmt. Group*, B-252879, *et. seq.*, Oct. 15, 1993, 93-3 CPD ¶ 227 .......... 30

*Rockwell Electronic Commerce Corp.*, B-286201, *et seq.*, Dec. 14, 2000, 2001 CPD ¶ 65 .......... 30

*SOS Interpreting, LTD.*, B-293026, *et seq.*, Jan. 20, 2004, 2005 CPD ¶ 26 .......... 30



**AGREED UPON REDACTED VERSION:
MADE BE MADE PUBLIC**

Plaintiff Advanced Systems Development, Inc. ("ASD"), by undersigned counsel, hereby timely replies to Defendant the United States' ("WHS") and Intervenor KENROB IT Solutions, Inc.'s ("KENROB") Oppositions to Plaintiff's Motion for Preliminary Injunction.

## I. SUMMARY OF ARGUMENT

Defendant and KENROB have failed to controvert the positions in ASD's motion. The Administrative Record ("AR") provides absolutely no contemporaneous support for the override determination and findings ("D&F"). Recognizing this, WHS concocts a post-hoc rationale, also not based on the AR, in an attempt to supplement (unsuccessfully) its deficiency, with the hope that this Court will not observe WHS's scheme. Regarding the standard for review, the best interest exception to the CICA stay does not provide WHS unfettered discretion and WHS cannot rely on a rationale that the AR does not support or that is post-hoc. As to the substance of the D&F, WHS ignored factors relevant to an override determination and submitted an invalid and insufficient supplement to the D&F. ASD also meets all of the other requirements for preliminary injunctive relief: ASD will suffer clear irreparable harm, while WHS will suffer no harm, and injunctive relief is in the public interest.

## II. STANDARD OF REVIEW AND THE ADMINISTRATIVE RECORD

### A. The Court Owes No Deference To Best Interest Overrides.

As more fully set forth in ASD's original Memorandum of Law, the Tucker Act requires the Court to review the D&F under the standards in section 706 of the Administrative Procedure Act ("APA"). Relying on *Spherix v. United States*, WHS and KENROB suggest that the "best interests" exception to the automatic stay is so lenient, it merely requires this Court's rubber stamp. (Def. Opp. at 14-15; Int. Opp. at 6-7.) That argument defies the "thorough, probing, in-depth review" the APA and other "best interests" override decisions of this Court require and cannot be reconciled with CICA's statutory language or its legislative history.

Supreme Court precedent instructs that the "standards of § 706 require the reviewing court to engage in a substantial inquiry." *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 415 (1971). To determine whether an agency's action is arbitrary and capricious, the reviewing court must conduct a "thorough, probing, in-depth review" of whether the agency action "was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Id.* at 413-16. The "strict and demanding" nature of the court's review under the APA standards does not change, even if the challenged agency decision may involve agency



AGREED UPON REDACTED VERSION:
MAY BE MADE PUBLIC

expertise. *Burlington Truck Lines v. United States*, 371 U.S. 156, 167 (1962) ("[U]nless we make the requirements of administrative action strict and demanding, expertise . . . can become a monster which rules with no practical limits on its discretion.")

For a best interest override to withstand the APA scrutiny that the Tucker Act requires, this Court performs a "searching and careful" inquiry to determine whether the D&F is unlawful under any one of four *independent* grounds set forth in *Motor Vehicles Mfrs. Ass'n of the United States v. State Farm Ins. Co.*, 463 U.S. 29, 43 (1983). *See e.g., CIGNA Government Servs. LLC v. United States*, 70 Fed. Cl. 100, 110 (2006); *PGBA, LLC v. United States,* 57 Fed. Cl. 655, 659 (2003). If the Court determines that *any one* of the *Motor Vehicle* grounds exist, it is "powerless" to uphold the D&F. *See SEC v. Chenery Corp.*, 322 U.S. 194, 196 (1947).

This Court's override case law and CICA's own language and legislative history expressly contradict the assertions in *Spherix* that a "best interests" override is an "easy course" for the agency to escape CICA's statutory presumption to stay contract performance following a protest or that such an override reflects a "disinclination by Congress to interrupt contract performance." In *PGBA,* this Court recognized that "urgent and



**AGREED UPON REDACTED VERSION:**
**MAY BE MADE PUBLIC**

compelling" circumstances, "which bring with them much more serious overtones, ought to be owed more deference." 57 Fed. Cl. at 660. The Court also noted that "a holding that best interests overrides are not reviewable would be tantamount to giving agencies a license to override the automatic stay at will," a result that contravenes both CICA's language and legislative history.

> Such a conclusion would not only render the "urgent and compelling" prong of the statute largely superfluous, but makes no sense in the context of a statute that was passed by Congress to strengthen the stay. The court simply cannot subscribe to the notion that the same Congress that, as repeatedly indicated in the legislative history of CICA, sought to bolster the GAO stay and prevent agencies from undercutting the protest review process would then arm agencies with the override option that could easily defeat those purposes—invocable essentially at will and with no judicial review.

*Id.*; *see also Universal Shipping Co. v. United States*, 652 F. Supp. 668 (D.D.C. 1987) ("To make a stay of a protested contract automatic in all but *extraordinary circumstances* is to display a suspicion of agency fairness altogether at odds with foreclosure of judicial review.") (Emphasis added). The same untenable result occurs if the Court adopts the "easy course" theory WHS and KENROB advance and permits agencies to cavalierly invoke "best interests" overrides (as WHS has done here) just to get on with their procurements. *See e.g., CIGNA*, 70 Fed. Cl. at 102 ("Absent the

stay, GAO's protest process . . . can be rendered illusory or 'toothless' if agencies cavalierly invoke best interest overrides and 'extremely tight' schedules just to get on with their procurements.")

**B. The AR Does Not Sustain The Contemporaneous Rationale In The D&F.**

Realizing that its findings in the D&F fall well short of reasoned decision making under this Court's precedent and that the AR submitted to the Court provides no support for WHS's inadequate D&F, WHS attaches to its Opposition the declaration of a non-decision maker, created weeks after WHS issued its D&F and ASD filed its complaint in this Court and six days after WHS submitted the AR. WHS also attaches purported "Supplemental Findings" in support of the June 21, 2006 D&F that the acting director of WHS issued on July 6, 2006 based on the statements in the litigation declaration rather than the AR. WHS's post-hoc rationalizations in the Supplemental Findings and the litigation declaration cannot save WHS's inadequate D&F.

The APA case law (including several "best interest override" decisions from this Court) make clear that the D&F must survive on the reasoning set forth within its four corners and not some "post hoc rationalization" WHS or its counsel proffer. To allow meaningful judicial



AGREED UPON REDACTED VERSION:
MAY BE MADE PUBLIC

review, the APA requires that the agency present a full and reasoned explanation of its decision. *Allentown Mack Sales & Servs., Inc. v. NLRB*, 522 U.S. 359, 374 (1998). This standard requires that the agency reach a sound decision and articulate the reasons for that decision. *Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.*, 419 U.S. 218, 285-86 (1974). Unsupported conclusions and ipse dixit assertions have no place in the APA's scheme of reasoned decision-making.

Moreover, WHS may not use the litigation declaration as a vehicle to fill the record with post-hoc rationalizations the decision maker did not consider when issuing the June 21, 2006 D&F. Supreme Court precedent dictates that the AR comprises only what was before the decision maker *at the time of the decision*. *Overton Park,* 401 U.S. at 420. In *Overton Park,* the Supreme Court rejected the agency's attempt to explain its decision through "litigation affidavits," concluding that the affidavits were not part of the AR but "merely 'post-hoc' rationalizations, which have traditionally been found to be an inadequate basis for review." *Id.* at 419.

*Overton Park's* progeny have made clear that the AR consists of all documents and materials *the decision maker considered in making the original decision*, nothing more, nothing less, and that the court's review is limited to the *contemporaneous reasons the agency articulated*. *See e.g.,*



**AGREED UPON REDACTED VERSION:**
**MAY BE MADE PUBLIC**

*Camp v. Pitts*, 411 U.S. 138, 143 (1973) ("The validity of the Comptroller's action must, therefore, stand or fall on the propriety of *that [contemporaneous] finding*.") (emphasis added). Similarly, agency explanations proffered *after* the challenged agency action deserve *no weight or deference* from the Court. *See Am. Textile Mfrs. Inst., Inc. v. Donovan*, 452 U.S. 490, 539 (1981) ("the post hoc rationalizations . . . cannot serve as a sufficient predicate for agency action."); *Am. Trucking Ass'ns. Inc. v. Fed. Highway Admin.*, 51 F.3d 405, 411 (4th Cir. 1995) ("it is the agency's actual reasoning that must prove reasonable, not the post hoc rationalization devised during litigation.")

*ATA Def. Indus., Inc. v. United States*, 38 Fed. Cl. 489, 498 (1997), which involves issuance of a justification and approval, provides guidance. There, the court granted a permanent injunction ordering the agency to suspend performance of and terminate a purchase order because the agency's decision to award without full and open competition violated 10 U.S.C. § 2304. *Id.* at 491-92. The agency included in the AR two written justifications for using other than competitive procedures covering the statutory exceptions set forth in 10 U.S.C. § 2304. *Id.* at 493. The first, which the contracting officer issued prior to the award, relied on the "one responsible source" exception. *Id.* The second, which the contracting



**AGREED UPON REDACTED VERSION:
MAY BE MADE PUBLIC**

officer issued subsequent to plaintiff's complaint, relied on the "unusual and compelling circumstances" exception. *Id.* The Court rejected the agency's post-litigation justification as "too late." *Id.* at 498.

> Application of the CICA anticipates that prior to entering a contract, an agency will make a reasoned determination as to which procedures, competitive or otherwise, would best serve the needs of the agency. If an agency attempts such a reasoned determination and acts consistent with that determination, then the agency is granted extensive deference. . . . But such deference is not granted where the agency changes its rationale for taking an action after a suit is instituted attacking the original rationale. Indeed, if deference were granted in such cases, a significant risk would arise that agency actions would be based on the desire to prevail in litigation rather than to further appropriate agency goals.

*Id.* at 498-99 (internal citations omitted).

Similarly, here, WHS, *weeks after it issued the D&F*, seeks to fill the record with additional (yet unsupported) allegations, which it *failed to consider prior* to issuing the D&F on June 21, 2006. (Supp. Findings at ¶¶ 5-7 (asserting that WHS *now* has calculated the potential savings of continuing with the WITS contract, the potential costs of terminating KENROB's contract for convenience, and the cost of re-transitioning ASD, and that WHS *now* has determined that with its alleged budget cuts it cannot continue with the multiple existing contracts).) CICA requires an agency to automatically stay the contract unless and until the head of the



**AGREED UPON REDACTED VERSION:**
**MAY BE MADE PUBLIC**

contracting activity makes rational written findings showing that either continued performance is in the best interests of the United States or compelling and urgent circumstances require continued performance.

In view of the foregoing, the Court should refuse to accept WHS's post-hoc justifications for the D&F set forth in the July 6, 2006 Supplemental Findings and Mr. Cox's July 5, 2006 declaration.

## III. ARGUMENT

### A. WHS's June 21, 2006 D&F Is Arbitrary, Capricious, Or Otherwise Not In Accordance With Applicable law.

#### 1. WHS Ignored Factors Relevant To The Override Determination.

This Court requires that best interests overrides evidence full consideration and objective analysis of *all* relevant issues prior to overriding the stay, including but not limited to: the costs involved if the awardee continues performance but GAO sustains the protest, the availability of incumbent contracts or alternative approaches and costs involved, and the statutory mandate of ensuring competition. *CIGNA*, 70 Fed. Cl. at 110-114; *Chapman Law Firm Co. v. United States*, 62 Fed. Cl. 464, 467-68 (2004), PGBA, 57 Fed. Cl. at 662-63. *WHS's failure to consider any one of these relevant considerations renders its D&F inadequate* and establishes that ASD will prevail on the merits. WHS failed to consider *all* of these relevant



AGREED UPON REDACTED VERSION:
MAY BE MADE PUBLIC

considerations.

**a. WHS Admits It Did Not Consider The Costs Involved If GAO Sustains ASD's Protest.**

WHS admits that, when WHS issued the June 21, 2006 D&F, WHS did not consider the costs involved if KENROB transitions and starts performance but GAO sustains ASD's protest. (Def. Opp. at 23-24.) WHS nevertheless argues that it has now (weeks after it issued the D&F and in the heat of litigation) considered those costs and its conclusion that the D&F is in the best interests of government remains. (*Id.* at 24.) This post-hoc rationalization cannot save WHS's inadequate override decision as a matter of law as discussed in section II.B.

The AR does not support the post-hoc rationalization in any event. In the Supplemental Findings, WHS states:

> WHS has calculated the potential costs to terminate KENROB's contract for convenience should ASD's protest be sustained. The direct cost savings, [redacted] per month, reaped by the WHS through performance of the consolidated contract during the override period pending GAO's decision, and, if necessary, the time required to re-evaluate the proposals, significantly outweighs the potential termination for convenience costs. This net positive cost savings coupled with the enhanced performance benefits for the IT systems supporting the Secretary of Defense and other Pentagon-based agencies make it in the nation's best interests to continue contract performance pending the ASD protest.



**AGREED UPON REDACTED VERSION:
MAY BE MADE PUBLIC**

(Supp. Findings at ¶ 5.) Nothing in the forty seven documents comprising the AR supports WHS's purported cost savings or details the likely termination costs for KENROB, if ASD's protest succeeds. (AR at *passim.*) In fact, the absence of the incumbent contracts and KENROB's contract or any analysis or comparison thereof in the AR plainly shows that the WHS decision maker never compared the costs of KENROB's performance to the costs of the incumbents' performance at the time he issued the D&F. Moreover, without reviewing the costs of the KENROB contract, the WHS decision maker could not and did not determine the costs of terminating the KENROB contract for convenience.

WHS, in support of its conclusory cost analysis, offers only the litigation declaration of Robert Cox, the Deputy Director of ITMD. (Def. Opp. at 18, Ex. A.) Mr. Cox, a non-decision maker for purposes of CICA override decisions, estimates the savings of moving forward with KENROB to be [redacted] per month and the costs of "re-transitioning" ASD to be [redacted] to [redacted]. (Cox Decl. at ¶ 9.) Neither calculation withstands the slightest scrutiny.

**i. The AR Does Not Support WHS's Post-Hoc Monthly Savings Calculation.**

Mr. Cox apparently arrived at the [redacted] per month savings figure



**AGREED UPON REDACTED VERSION:
MAY BE MADE PUBLIC**

by dividing the total estimated price of the incumbent contracts by twelve to arrive at a monthly price and subtracting that price from WHS's monthly target budget price for the WITS contract. (Cox Decl. at ¶ 5.) This calculation is flawed for several reasons.

First, the AR contains no support for the numbers Mr. Cox used. For instance, Mr. Cox's calculation assumes that the total price of the six incumbent IT support contracts is [redacted]. The incumbent contracts or billings are not part of the AR and the decision maker never considered them prior to issuing the D&F. Consequently, neither ASD nor the Court can verify Mr. Cox's assumptions. Nevertheless, the AR raises questions about Mr. Cox's incumbent total. The Acquisition Plan for this procurement, prepared in February 2006, states that WHS expected [redacted] from the consolidation of the incumbent contracts through the WITS procurement. (AR Tab 9 at 128, 136 §§ 1.3, 2.12.1.) The Plan budgets the WITS contract at [redacted] annually. (*Id.* at § 2.5, AR Tab 9 at 134.) WHS's budgeted cost for the WITS contract and its expected savings suggest the total cost of the current contracts is closer to [redacted], not [redacted].

Second, Mr. Cox's calculation does not account for the cost flexibility in the incumbent contracts. Several of the incumbent contracts are Time



**AGREED UPON REDACTED VERSION:**
**MAY BE MADE PUBLIC**

and Material contracts, which means that each month's invoice depends on the level of effort the WHS customer requires. (*See* 2d Decl. of Richard Bennett ("2d Bennett Decl.") at ¶ 2, 9, Ex. 1; Decl. of [redacted] at ¶¶ 2, 9, Ex. 2.) Third, as noted in section III.A.2. below, the Cox post-litigation calculation does not contemplate [redacted] ([redacted] Decl. at ¶¶ 8, 9, Ex. 2; Decl. of [redacted] at ¶ 8, Ex. 3; 2d Bennett Decl. at ¶¶ 8, 9, Ex. 1.)

Further, the WHS budget for the WITS contract is legally irrelevant to any purported cost savings calculation. Rather, the relevant inquiry is *what it will cost* WHS for KENROB to perform, an inquiry that WHS (even with its attempted second bite at the apple supplemental findings) failed to consider. KENROB's proposal (which was included in the AR) suggests that [redacted] (KENROB Proposal, AR Tab 17 at 647.) This is a cost [redacted] the IT Support services covered by the existing contracts and the WITS contract.



AGREED UPON REDACTED VERSION:
MAY BE MADE PUBLIC

### ii. The AR Does Not Support WHS's Post-Hoc Termination Cost Consideration.

WHS relies solely on the post-override statements of Mr. Cox for its termination costs consideration:

> ITMD has analyzed the potential costs of re-transitioning from KENROB to ASD. [redacted] However, [redacted] If GAO sustains ASD's protest and ASD wins re-evaluation, WHS anticipates that there will be minimal cost to retransition ASD because [redacted] The projected cost to retransition ASD is [redacted].

(Cox Decl. at ¶ 14. (Emphasis added).) Mr. Cox's conclusory analysis fails on multiple levels.

First, nothing in the AR explains the purported $[redacted] in "re-transition" costs to ASD. This Court requires that the agency present a record that meaningfully supports the positions taken in the involved best interest override. *See PGBA*, 57 Fed. Cl. at 661 (rejecting naked claim of cost harm). Second, Mr. Cox's post-override calculation fails to consider the "transition-out" or termination for convenience costs of KENROB, which include the contract price for completed supplies and services the

government accepted, the costs of settling and paying termination settlements to terminated subcontractors, a sum as profit on the cost incurred in the performance of the terminated work, and the reasonable costs of settlement of the work terminated. *See* FAR 52.249-2(g). Nothing in the AR or any of WHS's post-override statements evidence any WHS consideration or calculation of potential termination for convenience costs for KENROB. Accordingly, because WHS failed to consider and properly evaluate the costs if GAO sustains the Protest, the Court should find that the WHS D&F is arbitrary and capricious. *Chapman*, 62 Fed. Cl. at 468; PBGA, 57 Fed. Cl. at 662.

**2. WHS Did Not Consider Alternative Approaches Utilizing the Incumbent Contractors.**

WHS also acknowledges that it failed to properly consider possible alternatives using the incumbent contractors during the limited stay period. (Def. Opp. at 22-23)

Courts have long and uniformly required that an override decision must exhibit full consideration of available alternatives to overriding a stay. *See e.g.*, *Chapman*, 62 Fed. Cl. at 467; *cf. Alion Sci. & Tech. Corp. v. United States*, 69 Fed. Cl. 14, 29-30 (2005) (upholding override as rational, in part, because AR showed that agency officials first attempted



**AGREED UPON REDACTED VERSION:
MAY BE MADE PUBLIC**

(unsuccessfully) to obtain services by other means). WHS contends instead that it did not have to consider any such alternatives because continuing with fragmented contracts is the purported harm WHS seeks to avoid. (Def. Opp. at 22-23.) WHS argues (based only on Mr. Cox's post-override declaration) that WHS cannot proceed with the multiple contractor status quo because those contracts result in purported problems, including redundant skill sets, disparate email systems, and multiple helpdesks. (Cox Decl. at ¶¶ 6, 7.) WHS maintains for the first time that, without its anticipated WITS contract cost savings, the current contracts will have to be de-scoped dramatically resulting in substantially less services to WHS. (Def. Opp. at 23.) The AR and WHS's own arguments disprove WHS's "sky-is-falling" post-hoc arguments and parade of horribles tales.

WHS has been utilizing multiple contractors to perform IT services for many years. (*See e.g.*, [redacted] Decl. at ¶ 2, Ex. 2; [redacted] Decl. at ¶ 2, Ex. 3.) The AR lacks any evidence supporting WHS's post hoc complaint that the multi-contractor status quo purportedly is a less reliable IT support program than going forward with KENROB, a new contractor who is unfamiliar with the WHS IT environment and who proposed [redacted] (*Compare* AR at *passim with* Def. Opp. at 23.) In fact, the evaluation documents contained in the AR [redacted]



AGREED UPON REDACTED VERSION:
MAY BE MADE PUBLIC

[redacted] (AR Tab 41 at 2354 [redacted]

WHS's anti-incumbent argument also is internally inconsistent. On one hand, WHS complains that the current fragmented system consists of inefficiencies, redundant functions and skill sets, multiple help desks, multiple e-mail systems, etc. (Cox Decl. at ¶¶ 6, 7, 10.) Yet, WHS also complains (without any support) that if forced to continue with its existing contracts, the current contracts will have to be de-scoped, purportedly resulting in substantially less service. (*Id.* at ¶ 12.) WHS ignores the fact that it has already begun the migration to the enterprise support model under the existing contracts which will eliminate certain redundant functions (*e.g.*, multiple emails) and lead to reduced costs. (*See e.g.*, [redacted] Decl. at ¶¶ 5-8, Ex. 2; 2d Bennett Decl. at ¶¶ 3-8, Ex. 1; [redacted] Decl. at ¶¶ 5-8, Ex. 3; *see also*, AR Tab 9 at 138-46.) [redacted]



**AGREED UPON REDACTED VERSION:**
**MAY BE MADE PUBLIC**

[redacted] (2d Bennett Decl. at ¶ 5, Ex. 1.) WHS procured Microsoft's Active Directory ("AD") as the bridging technology and began to implement that technology for the enterprise model in 2005 with its existing contractors. (*Id.* at ¶ 6.) The final phase of this effort is server consolidation which WHS presently is performing. (*Id.*) The AD project creates an environment where users from all of WHS may easily be managed and connected to other WHS resources. (*Id.*) The enterprise effort has been accomplished by the collection of existing contractors. (*Id.* at ¶ 7.)

[redacted] (*Id.* at ¶ 7, 8; [redacted] Decl. at ¶¶ 7-8, Ex. 2; [redacted] Decl. at ¶ 7-8, Ex. 3.) Precedent exists for this [redacted] as this type of activity was necessary for the WHS implementation of the Microsoft AD technology in 2005 and 2006. ([redacted] Decl. at ¶ 7.) WHS never considered any of these alternatives or their costs, rendering its D&F arbitrary and capricious under this Court's precedent and *Motor Vehicles Mfs. Ass'n.* *See e.g., Chapman*, 62 Fed. Cl.



AGREED UPON REDACTED VERSION:
MAY BE MADE PUBLIC

at 467 ("best interests requires full consideration of alternative approaches and costs involved.")

**3. WHS Did Not Consider the Statutory Mandate Embodied in CICA of Ensuring Competition.**

In its Motion, ASD also challenges WHS's D&F for failing to consider the statutory mandate embodied in CICA to ensure competition. Neither WHS nor Intervenor argue otherwise; nor could they, because WHS's June 21, 2006 D&F expressly evidences an anticompetitive purpose: to allow KENROB the maximum opportunity to hire away [redacted] employees. (D&F, AR Tab 39 at ¶ 2283.) WHS's failure to consider the anticompetitive nature of its decision also serves as an independent basis for holding that the D&F is arbitrary and capricious.

**4. Assuming, *Arguendo*, That The WHS D&F Considered Each Necessary Aspect Of The Problem (Which It Did Not), The D&F Still Fails Because WHS Relied On Improper Factors It And Based Its Decision On Facts Not Supported By The AR.**

WHS's Opposition evidences a tacit admission that its reliance on an interest in recruiting incumbent personnel is not a valid basis for an override. Indeed, WHS apparently has abandoned its baseless "smooth transition" and "unscheduled loss of service" justifications stated in the June 21, 2006 D&F and relies instead upon its plan for a newer, better



**AGREED UPON REDACTED VERSION:**
**MAY BE MADE PUBLIC**

consolidated contract and related anticipated cost savings, and its allegedly strapped budget. WHS's remaining rationales fail as a matter of fact and law.

**a. Prospect of a Newer, Better Contract and Related Anticipated Cost Savings is Not a Valid Override Basis.**

This Court consistently has held that the mere fact that a new contract provides cost advantages and other efficiencies over the prior contract, cannot, by itself, support a best interest override. *See CIGNA,* 70 Fed. Cl. at 113 (increased costs by continuing the more expensive former contracts not valid for override); *Chapman*, 62 Fed. Cl. at 466 (newer, better contract generally not a valid override basis); *PGBA*, 57 Fed. Cl. at 662 (same). Any other result would render the stay meaningless and frustrate Congress' purpose in enacting CICA in virtually every recompetition of requirements as agencies typically refine needs, apply lessons learned, rely on new technology, which all have cost consequences. *PGBA*, 57 Fed. Cl. at 662.

The case of *University Research Co., LLC v. United States*, 65 Fed. Cl. 500 (2005), is instructive. In that case, the agency argued (as WHS does here) that overriding the stay was in the best interests of the government because the challenged contract award was *less costly* and a



**AGREED UPON REDACTED VERSION:
MAY BE MADE PUBLIC**

better value than the incumbent contract. *Id.* at 503. The Court granted the preliminary injunction enjoining the override. *Id.*

> [I]f a determination by a contracting officer that one bidder's proposal represented the best value to the government were sufficient for overriding the automatic stay, as a practical matter, the automatic stay would be meaningless in virtually every single instance in which a GAO protest was filed. Almost invariably when a contract is awarded through a competitive process, the award will be based on the awardee offering the government the best value, and in many cases this also means the contract will cost the government less money.

*Id.*

Both WHS and KENROB contend that cost savings somehow are different from the newer, better contract rationale, but this is a distinction without a difference. Moreover, their reliance upon *Spherix* and *Sierra Military Health Servs., Inc. v. United States*, is misplaced. In neither of those cases did the Court uphold the override decision simply because the challenged contract was expected to cost the government less money. Other extraordinary circumstances existed which are glaringly absent here.

In *Spherix*, the Court emphasized the fact that the consolidation of the recreation reservation services program was a "Presidential priority, not an ordinary governmental program, that has a long history and was beset with inter-agency rivalries." 62 Fed. Cl. 497, 506 (2004). The Court also emphasized that the timing of the transition was critical. *Id.* The agency



**AGREED UPON REDACTED VERSION:
MAY BE MADE PUBLIC**

had targeted the implementation to occur during the off-peak season of reservation activity in order to limit the inconvenience to the public of utilizing the new system and to prevent a rough transition of field staff from old to new systems and procedures. *Id.* at 500-01. The agency showed that the implementation period between the contract award and the start of the busy season in March was crucial in order to produce an effective system for the public to use when reservation activities increased in March. *Id.* Any delay in the implementation would push the start date for the new program until after the next busy season. *Id.*

The same timing constraints do not exist in this case involving an "ordinary government program." The AR evidences no firm "go-live" date for the consolidation of WHS IT support services. In fact, the AR shows that WHS originally planned June 1-June 30, 2006 as the initial transition period, but due to *agency delays* WHS pushed that date to July 1-July 31, 2006. (*See e.g.*, AR Tab 1 at 00001.) The AR also shows that [redacted] (*See e.g.*, AR Tab 23 at 1859 ([redacted]) Hence, although WHS attempts to argue that it is "imperative" for WHS to continue performance with KENROB, this post-hoc delay argument finds no AR support.



**AGREED UPON REDACTED VERSION:**
**MAY BE MADE PUBLIC**

Similarly, *Sierra* is distinguishable. The solicitation in *Sierra* concerned DoD's planned TRICARE Next Generation contracts ("T-Nex"), which combine 11 separate military healthcare administration contracts into three contracts. 58 Fed. Cl. 573, 574 (2004). The plaintiff in *Sierra* sought an injunction preventing performance in all three contracts even though it had only bid on one (unlike here where ASD seeks an injunction only against the contract it has protested), arguing that the contracts were interconnected. *Id.* at 576. Unlike the situation here, the incumbent contracts in *Sierra* were expiring and the agency had exhausted all option periods, making further use of the incumbent contracts an impossibility - without the override, needed healthcare services would not be available for dependents of active duty members and retired service members. *Id.* at 575, 581. The agency provided an extensive 15-page memorandum and a comprehensive record (unlike here) in support of the override decision. (*Id.* at 574.) The override decision expressly considered: the unavailability of the incumbent to continue providing services (not a factor here); the cost of contract extensions (not quantified here); the inability to shorten the transition schedule based on identified past experience and supporting record evidence (alternatives not considered here); the inability to move forward with other unchallenged jurisdictions with the stay in place (same);

and the costs of undoing the transition work should Sierra prevail in the protest (also not considered here). The Court had significant concerns regarding the impact that the stay would have on the availability of actual health care services and found the extensive override decision and detailed AR satisfactory under the APA. The *Sierra* decision bears few, if any, similarities to the existing dispute where WHS has failed to address numerous required considerations for a best interests override and failed to present evidence in the AR to support the few "justifications" offered.

KENROB's reliance on *Chapman Law Firm Co. v. United States*, 67 Fed. Cl. 188 (2005) ("*Chapman II*") also is misplaced. The Court did not uphold the override in *Chapman II* based on purported cost savings between the old and new contract. Rather, the Court upheld the agency's decision to continue performance of the challenged bridge contract because, without such performance, the agency *would be completely without the management and mortgage services covered by the contract*. *Id.* at 192. The lack of services would subject the agency's property and the communities in which the properties were located to "vandalism, gang infiltration, vagrancy, illegal dumping, health and safety issues, and code violations." *Id.* at 191. No similar concerns exists here.

Even assuming *arguendo* that the purported cost savings between an old and new contract is a valid basis for a stay override, the Court should reject WHS's supplemental finding of anticipated savings of [redacted] per month as insufficient grounds for the D&F for all the reasons stated *supra*. Not only is the purported savings amount not factually supported in the AR but the figures on which WHS relies are inherently flawed because they do not consider possible savings with the existing contracts, are derived from ITMD's budget expectations and not KENROB's contract, and are not diminished by the amount corresponding to the risk that the protest would be sustained.

Moreover, the AR raises doubts about WHS implication of enhanced performance benefits resulting from the override. (Supp. Findings at ¶ 5.) In fact, the evaluation materials indicate that, because KENROB [redacted] it remains unclear [redacted] (AR Tab 31 at 1978.) KENROB's proposals indicates that it will [redacted] well after GAO renders its decision. (AR Tab 17 at 646-68.)



**AGREED UPON REDACTED VERSION:**
**MAY BE MADE PUBLIC**

### b. WHS's Reduced Budget Rationale Also Fails.

WHS (relying on the litigation declaration of Mr. Cox) contends that the Court should allow WHS to end run CICA's strong presumption for a limited stay of contract performance during pending GAO protests because WHS planned on the WITS contractor meeting all of WHS's cost savings goals and did not plan for any protests or delays in obtaining those cost benefits.[1] (Def. Opp. at 20 ("these cost savings have already been incorporated into WHS' IT budget.")) An agency's failure to plan for protests and resulting costs offers no valid justification to ignore the dictates of CICA and override the automatic stay. *See e.g., PGBA*, 57 Fed. Cl. at 663 (rejecting override justification that resulted from agency's failure to factor in time for bid protests). Such a result would allow agencies to reduce their budgets in order to transform the limited override exception into the rule.

Further, the AR belies WHS's budget constraint arguments. The

---

[1] The acquisition plan for the WITS contract was prepared in 2006. (Acquisition Plan, AR Tab 9 at 126.) It seems unlikely that the savings WHS would achieve from the WITS contract were built into a budget that WHS prepared in 2005 (before the start of the fiscal year). Indeed, having exercised the options on the incumbent contracts and not having even begun the acquisition process for the WITS contract, it stands to reason that WHS's FY 06 budget actually contemplated full contract performance under the incumbent contracts, and not savings under a yet to be planned consolidated contract. (*See, e.g.,* AR Tab 6 at 34 (showing Presolicitation Notice posted on January 26, 2006).)

funding requests in the AR show that, on May 19, 2006, one month before WHS's D&F, WHS urgently sought and promptly obtained an additional [redacted] for the WITS contract. (AR Tab 8 at 48-52.) The ease with which WHS obtained this nearly [redacted] in additional funding quashes WHS's post-hoc and conclusory complaints that, without continued performance of the WITS contract, WHS will not be able to provide administrative and operational services to its DoD clients due to a budget shortage. (Def. Opp. at 8.)

**B. ASD Will Suffer Irreparable Harm Absent Injunctive Relief.**

Because ASD has shown that WHS's D&F was arbitrary and capricious, the law provides ASD a presumption of irreparable harm. *See e.g., Transatlantic Lines LLC v. Strong Vessel Operators*, LLC, 68 Fed. Cl. 48, 57 n.12 (2005); *CW Gov't Travel, Inc. v. United States*, 61 Fed. Cl. 559, 557 (2004) ("A movant that clearly establishes likelihood of success on the merits receives the benefit of a presumption of irreparable harm.") Beyond this basic presumption, ASD demonstrated in its original Memorandum of Law that KENROB's performance of the WITS contract pursuant to the stay override will harm ASD in multiple ways, including providing KENROB multiple competitive advantages and hindering ASD in a future evaluation of proposals, if ASD is ultimately successful in its protest at GAO, each of



**AGREED UPON REDACTED VERSION:**
**MAY BE MADE PUBLIC**

which alone establishes the existence of irreparable harm to ASD. (Pl. Mem. at 31-32.) Neither WHS or KENROB succeed in rebutting these harms.

**1. ASD will be Harmed Irreparably by the Knowledge that KENROB will Gain in Performing the Contract.**

Every day of experience that KENROB gains performing the WITS contract is one more day that ASD suffers competitive harm. The WITS contract is a completely new format whereby each offeror proposed its own statement of work to meet the WHS objectives. WHS admits that [redacted] ¶ [redacted] Essentially, KENROB will have had a trial run opportunity to test its proposed solution during the protest period.

The Court in *CIGNA* discussed in detail this precise harm, in an analogous situation involving the restructuring of existing contracts:

> Cigna will be harmed if GAO grants its protest and orders a reprocurement because its competitors will be gaining an understanding of the requirements of the Solicitation by performing the new, restructured, consolidated work. . . . Doing the work under the Solicitation may enable [the awardees] to gain insights which could aid them in amending their proposals should GAO order such a remedy.



**AGREED UPON REDACTED VERSION:**
**MAY BE MADE PUBLIC**

*CIGNA,* 70 Fed. Cl. at 112-13. As was the case in *CIGNA*, ASD will suffer harm from the insight KENROB will gain by performing its solution under the new, restructured, consolidated contract.

WHS seeks to counter this argument by contending that "any knowledge or experience KENROB gains during the protest period will only level the playing field." (Def. Opp. at 25.) WHS's contention misses the point. ASD's harm results from KENROB's ability to refine its *proposed* solution not from performance of the incumbent work.

WHS also challenges ASD's argument, complaining that ASD bases its harm on the "false assumption" that GAO will recompete the WITS contract. (Def. Opp. at 25, 26.) WHS attempts to support this contention by arguing that ASD's protest generally challenges the manner in which WHS evaluated the proposals, and, therefore, GAO would likely only recommend re-evaluating the existing proposals. (*Id.*) Again, WHS's argument misses the mark.

First, as even WHS acknowledges, ASD also has protested that WHS conducted misleading discussions, which, if successful, would require WHS to reopen the procurement, conduct additional discussions, and request new proposals. (ASD Protest at 33, Ex. 6 to ASD's PI Mem.) Although ASD's specific protest challenge relates to the price proposal discussions,



**AGREED UPON REDACTED VERSION:**
**MAY BE MADE PUBLIC**

a change in the price proposal based on additional discussions with WHS may affect the technical proposal. Consequently, no reason exists for the Court to assume that a reopening of the competition would be limited to price proposals. *See e.g.*, *DTH Mgmt. Grp.*, B-252879, *et seq.* Oct. 15, 1993, 93-2 CPD ¶ 227 (recommending that agency reopen discussions and obtain new BAFOs where agency conducted misleading discussions regarding protester's *price*).

Second, ASD bases its technical and best value evaluation challenges on WHS's failure to follow the evaluation scheme and criteria set forth in the Solicitation. (ASD Protest at 43, Ex. 6 to ASD's PI Mem.) When protesters have successfully proven such challenges, GAO generally recommends that agencies re-open discussions, obtain revised proposals, and, where necessary, first issue revised solicitations. *See, e.g.*, *SOS Interpreting, LTD.*, B-293026, *et seq.*, Jan. 20, 2004, 2005 CPD ¶ 26; *Rockwell Electronic Commerce Corp.*, B-286201, *et seq.*, Dec. 14, 2000, 2001 CPD ¶ 65.

Finally, as discussed below, if the Court does not reinstate the stay, [redacted] (KENROB Prop., AR Tab 17 at 647.) As such,



**AGREED UPON REDACTED VERSION:**
**MAY BE MADE PUBLIC**

[redacted] requiring WHS to amend the Solicitation and reopen the competition.[2]

**2. ASD Will be Harmed Irreparably Because KENROB [redacted].**

If the Court does not reinstate the stay, [redacted] (KENROB Prop., App. D., AR Tab 17 at 647 ([redacted]).) This [redacted] will compromise ASD's proposed solution, which [redacted] and make the improper award to KENROB a *fait accomplis*. (*See* ASD Proposal, AR Tab 18 at 1092; Statement of Objectives, § 3.3, AR Tab 12 at 336.)

WHS attempts to discount this competitive harm by asserting that WHS [redacted] and, therefore, should ASD succeed before GAO, [redacted] (Def. Opp. at 27, Cox Decl. at ¶ 14.) Even assuming that [redacted] would be practical following multiple transitions, WHS does not address what would

[2] KENROB acknowledges that WHS will need to revise the Solicitation to account for [redacted]. (Int. Opp. at 13.)



AGREED UPON REDACTED VERSION:
MAY BE MADE PUBLIC

happen after [redacted]. It is unreasonable to assume that WHS would [redacted], considering that it will have [redacted] (*See* KENROB FPR Vol. III, AR Tab 23 at 1821.) Indeed, the fact that WHS will no longer have the [redacted] and that, with the override, WHS will have [redacted] will forever change the competitive playing field to ASD's detriment in any reevaluation or recompetition. How can WHS justify a solution that [redacted] as the best value? In order to level the playing field WHS will have to [redacted] and allow all offers [redacted].

WHS also tries to defuse the harm ASD faces by contending that WHS can remedy the harm to ASD *after* contract award by allowing ASD to submit a change order [redacted]. (Def. Opp. at 27.) WHS myopic argument lacks merit. Requiring ASD to work under [redacted] is not simply a matter of [redacted]. Many aspects of ASD's proposal will [redacted] Moreover, waiting to relieve ASD's harm until *after* contract award begs the question of [redacted]



**AGREED UPON REDACTED VERSION:
MAY BE MADE PUBLIC**

[redacted] is the best value to the government.

### 3. ASD will Suffer a Competitive Disadvantage Without Injunctive Relief Because KENROB is Hiring Away ASD's Employees.

Since June 21, 2006 when WHS issued the override, ASD [redacted] have lost [redacted] employees to KENROB and KENROB's teammates. (2d Bennett Decl. at ¶ 10, Ex. 1; [redacted] Decl. at ¶ 10, Ex. 2, [redacted] Decl. at ¶ 9, Ex. 3.) WHS and KENROB complain that [redacted] employees because of the stay override is simply a monetary loss and, therefore, does not constitute irreparable harm. Again, the opposition arguments miss the point. ASD does not claim any increased costs associated with re-hiring the incumbent employees. Rather, ASD asserts a *competitive* harm that arises from WHS issuing an override in order for KENROB to steal away the ASD [redacted] personnel. As discussed in ASD's original motion and evidenced in the AR, one of ASD's discriminators in the [redacted] competition was its [redacted]. (*See* PEB May 22, 2006 Briefing, AR Tab 31 at 1959-60.) ASD received [redacted] rating [redacted] KENROB received [redacted] rating. (*Id.* at 1961.) Allowing the override to stand and KENROB to continue to hire

away ASD's personnel will [redacted] altering the playing field in any reevaluation or reopening of the competition to ASD's detriment.

### C. Any Purported Harm To WHS (And KENROB) Is Minimal And Does Not Outweigh The Harm To ASD.

ASD also has met its burden of showing that the balance of harms favors ASD, because any harm to WHS (and KENROB, to the extent it is even relevant) is minimal.

#### 1. The AR Does Not Support WHS's Purported Harms.

GAO must issue its decision in ASD's Protest no later than September 22, 2006. (*See* Pl. Mem. at 32.) WHS can continue receiving uninterrupted services from the incumbent contractors until that time. (*See* [First] Bennett Decl. at ¶ 24, Pl. Mem. Ex. 2; [redacted] Decl. at ¶ 4, Ex. 2; [redacted] Decl. at 4, Ex. 2.) [redacted] In fact, WHS has already begun to migrate its infrastructure to an enterprise approach under the existing contracts, which will result in cost savings. (*See e.g.*, [redacted] Decl. at ¶ 5, 8, Ex. 2.)

The only purported harms that WHS has expressed are the inadequate and baseless newer, better contracts, purported cost savings



AGREED UPON REDACTED VERSION:
MAY BE MADE PUBLIC

and budget-based arguments in WHS's D&F. These purported "harms" fail for the reasons discussed in section III.A. *supra*. The record establishes that WHS can continue to mitigate its fragmentation complaints by pursuing its enterprise migration using its incumbent contractors as it has done throughout 2006. The record is devoid of any evidence establishing that WHS can only achieve efficiencies by continuing performance with KENROB or that WHS will lose necessary services should the incumbents continue performance.

The AR also disproves WHS's specious argument regarding delay (a post-hoc rationalization as noted *supra* at III.A.4.a.) due to reevaluation. The AR shows that WHS conducted competitive range discussions, FPR submissions, FPR evaluations, and the award determination in a period of 22 days! (PEB Briefing to SSA, AR Tab 31 at 1891.)

**2. The AR Belies KENROB's Assertion of Harm.**

Assuming *arguendo* that any harm resulting to KENROB by reinstating the CICA mandated stay is a legally relevant consideration (which it is not), the AR disproves KENROB's allegations of harm. *Cardinal Maint. Serv., Inc. v. United States*, 63 Fed. Cl. 98, III (2004) (holding that alleged harms to awardee are discounted because awardee "was the beneficiary of a CICA violation and, as such, suffers no harm when the



**AGREED UPON REDACTED VERSION:
MAY BE MADE PUBLIC**

violation is corrected.") The primary harm KENROB asserts appears to center around the incumbent employees who KENROB has or will attract from the current contractors, and who KENROB may have to terminate if the Court reinstates the stay. (Int. Opp. at 18-22.) KENROB inexplicably characterizes this as [redacted]. KENROB also cites a fear of [redacted] (Int. Opp. at 19.)

KENROB only has the opportunity to hire away incumbents as a result of an improper stay override. Although staying KENROB's performance may cause some employees to leave KENROB, *the same result will happen* if ASD is ultimately successful in its protest and wins the WITS contract award. KENROB's fear of [redacted] are unfounded for similar reasons. [redacted].

In a related argument, KENROB states that it would be competitively harmed by a general exodus of incumbent employees from the WHS community if the Court reinstates the stay. [redacted]



AGREED UPON REDACTED VERSION:
MAY BE MADE PUBLIC

[redacted] (*See* KENROB Prop., AR Tab 17 at 645.) [redacted]" (*Id.* at 646.) Therefore, KENROB need not fear the alleged WHS incumbent employee exodus.

Another "harm" that KENROB cites is [redacted] (Int. Opp. at 23.) KENROB asserts that this [redacted], and if the Court reinstates the stay, KENROB will not be able to [redacted] (*Id.*) Once again, KENROB's assertions are disproved by its own proposal. In Volume III of its FPR, KENROB states:

[redacted]

(KENROB FPR Vol. III, AR Tab 23 at 1859.)



**AGREED UPON REDACTED VERSION:
MAY BE MADE PUBLIC**

Accordingly, because ASD will suffer irreparable harm if the Court does not reinstate the stay pending GAO's determination, whereas, WHS and KENROB (to the extent relevant) will suffer little cognizable harm, if any, if an injunction issues, the balance of harms tips decisively in ASD's favor.

**D. Injunctive Relief is in the Public's Interest.**

WHS's and KENROB's arguments that an injunction is against the public interest lack merit. Each simply regurgitate their baseless newer, better contract arguments and faulty view of Congress' intent in enacting the CICA stay provisions. (Def. Opp. at 32-33; Int. Opp. at 25-26.) WHS also implies that it is in the public interest to keep to WHS's schedule. (Def. Opp. at 33.) But as noted, *supra*, this post-hoc rationalization finds *no* support in the AR. Moreover, the record shows that WHS has been eliminating redundancies and streamlining resources with its incumbent contractors and can continue to do so if the Court reinstates the stay. (*See e.g.*, [redacted] Decl. at ¶¶ 5-8.) WHS and KENROB also ignore the fact that this Court has held that the public's interest lies in preserving the integrity of the competitive process by requiring that the automatic stay prevails unless the agency makes the required showing that one of the limited exceptions exist and that the agency's determination is based on

reasoned decision making. *See e.g.*, *PBGA,* 57 Fed. Cl. at 663. Anything less will result in agencies cavalierly invoking best interest overrides (as WHS did here) just to get on with their procurements and undercut the competitive purposes for which Congress enacted the CICA stay provisions.

## IV. CONCLUSION

Because ASD has shown that WHS's D&F was arbitrary and capricious as a matter of fact and law, that the harm to ASD caused by the override greatly outweighs any purported harm to WHS (or KENROB) that may result from reinstituting the stay, and that granting the relief ASD seeks serves the public interest, the Court should grant ASD's motion for preliminary injunction and enjoin WHS and KENROB from performing on the WITS contract.

Dated: July 10, 2006

Respectfully submitted,

HOLLAND & KNIGHT LLP

s/Paul E. Pompeo
Paul E. Pompeo
2099 Pennsylvania Avenue, N.W., Suite 100
Washington, D.C. 20006
(202) 457-7033 – phone
(202) 419-2913 – fax

*Counsel for Advanced Systems Development, Inc.*

Of Counsel:

Kara L. Daniels
David J. Craig
HOLLAND & KNIGHT LLP
2099 Pennsylvania Avenue, N.W., Suite 100
Washington, D.C. 20006
(202) 457-1830 – phone
(202) 419-2727 – fax



**AGREED UPON REDACTED VERSION:
MAY BE MADE PUBLIC**

# EXHIBITS REDACTED IN FULL

# 3903993_v2

**AGREED UPON REDACTED VERSION:**
**MAY BE MADE PUBLIC**