# In the United States Court of Federal Claims

Case No. 06-484C
(**Filed Under Seal**: July 21, 2006)
(Reissued July 28, 2006 - FOR PUBLICATION[1])

| | | |
|---|---|---|
| * * * * * * * * * * * * * * * * * * * * * * * * * * | * | Post-award Bid Protest; |
| **ADVANCED SYSTEMS** | * | Override of CICA Stay; |
| **DEVELOPMENT, INC.,** | * | Supplemental Determination and |
| *Plaintiff,* | * | Findings; |
| | * | Consideration of Materials Outside of |
| v. | * | the Administrative Record; |
| | * | Declaratory Judgment. |
| **THE UNITED STATES OF AMERICA,** | * | |
| *Defendant,* | * | |
| | * | |
| and | * | |
| | * | |
| **KENROB IT SOLUTIONS, INC.,** | * | |
| *Intervenor.* | * | |
| | * | |
| * * * * * * * * * * * * * * * * * * * * * * * * * * | * | |

    **Paul E. Pompeo**, Holland & Knight, LLP, Washington, D.C., attorney of record for Plaintiff.  Of Counsel are Kara L. Daniels and David J. Craig.

    **Nancy Myung-Jin Kim**, Commercial Litigation Branch, Department of Justice, Washington, D.C., attorney of record for Defendant.  With her on the briefs were **Peter D. Keisler**, Assistant Attorney General; **David M. Cohen**, Director; and **Jeanne E. Davidson,** Deputy Director.  **Andrew Bramnick**, Assistant General Counsel, Washington Headquarters Service, Of Counsel.

    **John Scott Hommer, III**, Venable LLP, Washington, D.C., attorney of record for Intervenor.

    **John Bergen**, Law Clerk; **Eric J. Lipton**, Intern.

---

    [1]The public version is identical to the sealed version with the following exceptions: Of Counsel are listed for Plaintiff; the date on page 3 has been corrected to June 14, 2006; and the specific dollar amount on page 15 has been replaced with brackets.

## ORDER/OPINION

**BASKIR**, Judge.

This case arises out of Plaintiff's bid protest pending at the Government Accountability Office (GAO), and the associated stay in contract performance imposed by the Competition in Contracting Act (CICA), 31 U.S.C. § 3553. In the present action, Advanced Systems Development, Inc. (ASD), the unsuccessful offeror in the underlying procurement, challenges the Defendant's decision to override the "CICA stay," pursuant to Section 3553(d)(3)(c) of the Act, based on the determination that it is in the best interests of the United States to proceed with contract performance by Intervenor, KENROB IT Solutions, Inc. (KENROB), pending the outcome of the GAO protest.

On June 26, 2006, ASD moved for injunctive and declaratory relief in order to prevent further performance of this contract until adjudication of ASD's protest by the GAO. **For the reasons stated herein, Plaintiff's motion is GRANTED in part, and DENIED in part.**

## BACKGROUND

*Procurement History*

Plaintiff is a small business that provides enterprise Information Technology (IT) solutions and other similar services. The company is an incumbent contractor for various IT support with Defendant through the Washington Headquarters Services (WHS). Bennet Decl. at ¶ 2. WHS is a field activity of the Department of Defense (DoD) comprised of eleven directorates which provide support to the Secretary of Defense and other DoD activities. Prior to the contract award at issue in this case, WHS had six separate contracts with five different companies to meet its IT support needs. Administrative Record (AR) at 335.

The agency determined that it would be more efficient to consolidate the separate IT systems into one integrated system provided by one contractor. Consequently, on March 9, 2006, WHS issued Solicitation No. HQ0034-06-R-1012 for a new consolidated WHS IT Support services contract. AR at 191. The procurement sought a total small business set aside to acquire labor, hardware/software and other materials necessary to provide WHS and its clients with "a flexible, responsive platform of IT services," including support-like web management and software development. The solicitation listed certain evaluation factors and stated that a contract would be awarded to the offeror whose proposal provided the best overall value to the Government. AR at 266-72.

On April 12, 2006, ASD, KENROB IT Solutions Inc. (KENROB), and three other offerors submitted timely proposals to WHS in response to the solicitation. Based on preliminary evaluations, WHS was interested only in offers from ASD and KENROB. AR at 1557. After receiving the companies' final proposals, the agency found that KENROB represented the best value. On June 5, 2006, KENROB was awarded the WHS Information Technology Support contract. AR at 1998.

### *GAO Protest*

On June 14, 2006, ASD filed a timely bid protest with the GAO concerning the award of the IT support contract. Plaintiff argues that the WHS price evaluation scheme was flawed, WHS failed to conduct meaningful discussions with ASD regarding its price proposal, and the agency erred in its evaluation of ASD's and KENROB's technical and management proposals under the best value evaluation scheme. On June 14, 2006, GAO notified WHS of the bid protest and thus triggered the automatic stay provisions of the CICA.

As the following discussion illustrates, compliance with the statute requires the contracting officer to "direct the contractor to cease performance under the contract and to suspend any related activities that may result in additional obligations being incurred by the United States under the contract." 31 U.S.C § 3553(d)(3)(A)(ii). Furthermore, "performance [of the challenged contract] may not be resumed while the protest is pending." *Id*. at § 3553(d)(3)(B). The GAO is scheduled to issue its report in this case no later than September 22, 2006.

### *Override of the CICA Stay*

Rather than await the GAO's report, however, the agency chose to proceed. On June 21, 2006, WHS directed KENROB to continue performance of the new contract and issued its "Determination and Findings to Proceed with Contract Performance After Receipt of a Protest." In a 10-paragraph document, Mr. Ralph Newton, acting director of WHS, outlined the basis for the agency's decision to override the CICA stay. The report provides three primary reasons for WHS's decision to continue performance of the challenged services contract – inefficiency of the current model, the need for a smooth transition by permitting the awardee to immediately hire incumbent personnel, and avoiding a loss of IT services to the customer – found in paragraphs 8, 9 and 10, respectively:

> 8. Suspending performance of the KENROB contract during the pendency of this bid protest is not in the public interest. The current fragmentation of IT support [into six contracts] combines high costs with low performance and represents a poor use of federal funds. In addition, extending the existing contracts prolongs the problem without the opportunity for mitigation in the interim. Using six different IT support contracts is inherently

> inefficient and there is nothing short of the consolidation of services contemplated by this contract, that can make this operation more efficient.
>
> 9. A suspension in contract performance would frustrate efforts to provide a smooth transition to a new service provider. Notwithstanding the fact that KENROB can fully staff the job with its own resources, it is in the Government's interest to retain as many of the incumbent contractor's qualified staff as possible. These individuals, many of whom have been supporting WHS for an extended period, have developed valuable knowledge that would be difficult to replicate. Suspending performance would put these invaluable individuals, who are qualified and would otherwise be interested in accepting an employment offer from KENROB, into limbo. KENROB, with contract performance suspended, cannot hire them. Their current employer, even with a contract extension, could not offer stable employment for more than a few months and these individuals would likely seek other opportunities elsewhere.
>
> 10. Avoiding an unscheduled loss of service [to Department of Defense employees] is of paramount importance. The WHS network supports: critical building operations at the Pentagon (i.e. electricity, air conditioning, etc.), the Defense Finance and Accounting Service (payment office for thousands of contracts), the Office of the Secretary of Defense, and more than 2500 other users and customers of WHS information technology. The public interest demands that every effort be made to ensure a smooth transition and delaying implementation of a more streamlined and effective approach to providing IT support would be imprudent.

Determination and Findings to Proceed with Contract Performance After Receipt of a Protest (June 21, 2006) (D&F) at ¶¶ 8-10; AR at Tab 39.

      Pursuant to the statute and its implementing regulations, the WHS Director may "authorize contract performance, notwithstanding the protest" on one of two grounds: (1) "[c]ontract performance will be in the best interest of the United States;" and (2) "[u]rgent and compelling circumstances that significantly affect the interests of the United States will not permit waiting for the GAO's decision." 48 C.F.R. § 33.104(c)(2)(I). The Director issued the override only on the first ground. The formal Determination reads as follows:

> In accordance with the procedures described at Part 33.104(c)(2)(I) of the Federal Acquisition Regulation, as the head of the Head of the Contracting Activity [sic], I hereby determine that permitting KENROB to proceed with contracting performance is in the best interests of the United States.

D&F, "Determination"; AR at Tab 39.

*Procedural History*

On June 26, 2006, ASD filed a protest in this Court seeking injunctive and declaratory relief. In its formal motion and accompanying memorandum, ASD challenges the WHS determination to override the CICA stay. The Court promptly held a Preliminary Status Conference on June 27, 2006. At that status conference, the Court granted KENROB's Motion to Intervene and then set an expedited briefing schedule.

The Defendant filed the administrative record on June 30, 2006. The record, submitted as a CD, included an extensive array of documents pertinent to the procurement, but did not contain any material directly relevant to the agency's override decision, except for the two-page D&F.

The Defendant subsequently filed its Opposition to Plaintiff's Motion for Preliminary Injunction on July 6, 2006, as did the Intervenor. The Defendant's opposition "relied upon the complaint, the administrative record, the following brief, and attached exhibits." Defendant's Opposition (Def. Opp.) at 1. One of those exhibits was a document that purports to be a "Supplemental Determination and Findings to Proceed with Contract Performance After Receipt of a Protest"; the document is dated July 5, 2006, the day before the brief was filed. Def. Opp. at Tab B.

In the so-called "Supplemental Findings," the acting director of WHS further considered the previous WHS override and found that continued performance outweighed any potential benefits from the CICA stay should ASD win its bid protest. According to him, if WHS had to resort to its six incumbent contracts, the contracts "would have to be de-scoped dramatically, which will result in significantly degraded service to WHS' customers." Supplemental D&F at ¶ 7.

Also included as an exhibit attached to Defendant's brief was a fourteen paragraph declaration from Mr. Robert Cox, WHS Deputy Director for IT Management Directorate. *See* Def. Opp. at Tab A. The declaration, also dated July 5, 2006, contains information that appears to have been relied upon by Mr. Newton in his Supplemental Findings issued the same day. Mr. Cox further outlines justifications for the agency's decision to override the CICA stay. Of particular note is his opinion that, without the override, "it is highly probable that several key support services . . . would be rendered inoperable." Decl. of Robert Cox at ¶ 12. The Deputy Director also

concludes that "[t]he Pentagon would lose its ability to effectively track goods and deliveries that enter and exit the facility [posing] risk of a security breach." His document also provides purported dollar savings that would flow from the override. *Id*. at ¶ 13. This is the first time that such concerns had been expressed by WHS.

We have received no written motion to supplement the administrative record, which was filed six days prior to the creation of these two documents. We address this matter more fully in the discussion below.

On July 10, 2006, ASD filed its Reply Brief, its first opportunity to respond since the filing of the administrative record and the additional material accompanying the Defendant's brief. Plaintiff does not argue the merits of the underlying GAO protest in this action. The Plaintiff filed this protest solely to enforce the CICA automatic stay provisions triggered by its bid protest. Plaintiff objected to the Determinations and Findings supporting the continuation of contract performance. Plaintiff also attacked the Cox Declaration and the Supplemental Findings exhibits as "post-hoc rationalizations" not properly before the Court. Despite its procedural objections, Plaintiff preserved its position on those documents by also addressing the legal sufficiency of the new override justifications. At the conclusion of oral argument, heard on July 17, 2006, we ruled that the Defendant's newly offered exhibits were out of order. We shall address this issue in more detail below in our treatment of the case in chief.

## **DISCUSSION**

### *Standard of Review*

This Court has jurisdiction over bid protests pursuant to the Tucker Act, which provides in pertinent part:

> [T]he United States Court of Federal Claims shall have jurisdiction to render judgment on an action by an interested party objecting to. . . any alleged violation of statute or regulation in connection with a procurement.

28 U.S.C. § 1491(b)(1). It is now well settled that this jurisdiction extends to challenges to an agency's decision to override the automatic stay provisions of the CICA. *See RAMCOR Servs. Group, Inc. v. United States*, 185 F.3d 1286, 1289 (Fed. Cir. 1999) (pre-award override based on urgent and compelling circumstances provision); *PGBA, LLC v. United States*, 57 Fed. Cl. 655, 659 (2003) (post-award override based on best interests of the United States provision). *But see Spherix, Inc. v. United States*, 62 Fed. Cl. 497, 505 (2004) (argues for more deferential review of best interests override).

We review bid protests under the standards set forth in the Administrative Procedures Act (APA), 5 U.S.C. § 706(2)(A). *See* 28 U.S.C. § 1491(b)(4). Pursuant to that statute, the Court may overturn an agency's override decision only if it is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. 5 U.S.C. § 706(2)(A). The Supreme Court has defined judicial review under the APA in exceedingly narrow terms. Rather than second-guessing the agency's decision or substituting its own judgment for that of the responsible agency official, the Court considers "whether the decision was based on a consideration of the relevant factors and whether there has been a clear error in judgment." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971) (citations omitted).

Plaintiff points to four factors, any one of which may render a decision arbitrary and capricious. The decision fails the strict APA standard if the agency: 1) "relied on factors which Congress has not intended it to consider," 2) "entirely failed to consider an important aspect of the problem," 3) "offered an explanation for its decision that runs counter to the evidence before the agency," or 4) the decision "is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of the United States. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983); Pl. Br. at 3.

In short, the Court must look to see whether the agency considered the relevant factors and made a rational decision based on those factors. *Advanced Data Concepts, Inc. v. United States*, 216 F.3d 1054, 1058 (Fed. Cir. 2000). For an accurate picture of the relevant factors in an override case such as this one, we must consider the Competition in Contracting Act of 1984 and, in particular, the objectives behind its automatic stay feature.

### *The Requirements of CICA*

A disappointed bidder may file a protest of a federal procuring agency's contract award with the GAO, pursuant to CICA, 31 U.S.C. § 3553(a). A protest may also be filed in this Court. A major difference between the two protest avenues is that a decision of this Court is a legal judgment the parties are bound to observe. A GAO decision adverse to an agency is only a recommendation – the GAO has no enforcement powers. *See Ameron, Inc. v. United States Army Corps of Eng'rs*, 809 F.2d 979, 995 (3rd Cir. 1986). Bid protest cases filed at the GAO involve procedures far different than similar protests filed in this Court. Within one day of the filing of a bid protest at the GAO, the Comptroller General must notify the agency involved. 31 U.S.C. § 3553(b)(1). If the federal agency receives notice of the bid protest within ten days of the contract award, § 3553(d)(4)(A), then the contracting officer must order all performance under the protested contract to halt immediately, if such performance has already begun. § 3553(d)(3)(A)(ii). Once in effect, this automatic stay will ordinarily last for the duration of the pending bid protest. § 3553(d)(3)(B).

In the case of post-award protests, an agency may override the stay and authorize performance under the protested contract if the head of the procuring activity for the agency makes a written finding that:

(i) performance of the contract is in the best interests of the United States; or
(ii) urgent and compelling circumstances that significantly affect interests of the United States will not permit waiting for the decision of the Comptroller General concerning the protest.

§ 3553(d)(3)(C). In pre-award challenges, the agency may continue with the award and performance of the contract only upon a written finding of "urgent and compelling circumstances." § 3553(c)(2)(A). In the present case, however, ASD filed a challenge after the GAO announced the award to KENROB. The acting director of WHS issued a timely override, dated June 21, 2006, based solely on the "best interests" exception to the automatic stay.

*Override Determination*

The U.S. Court of Federal Claims has on many occasions considered the Government's compliance with the aims of CICA. We cannot improve upon Judge Allegra's comprehensive treatment of the legislative objectives of the CICA stay provisions in *PGBA, LLC v. United States*, 57 Fed. Cl. 655 (2003); therefore, we use it as our model in reviewing WHS's compliance with the statute. The automatic stay is intended to preserve the *status quo* during the pendency of the protest so that an agency would not cavalierly disregard the GAO's recommendation to cancel the challenged award. *Id.* at 660, n.8 (quoting *Lear Siegler, Inc. Energy Prods. Div. v. Lehman*, 842 F.2d 1102, 1105 (9th Cir. 1988), *mod. on other grounds*, 893 F.2d 205 (9th Cir. 1989)). The overarching goal of the stay is to preserve competition in contracting and ensure a fair and effective process at the GAO. *Id.* Therefore, WHS may only override the automatic stay upon a proper determination that the best interests of the United States outweigh this Congressional policy. *Id.* at 663. In this regard, WHS has utterly failed.

On its face, the D&F is legally insufficient. It explicitly proclaims that the challenged acquisition should proceed because "the current fragmentation of IT support combines high costs with low performance and represents a poor use of federal funds." D&F at ¶ 8. In other words, the new contract is cheaper and better than the old contract. The allegation that the new contract is better than the old one in terms of cost or performance is not enough to justify a best interests determination. *PGBA*, 57 Fed. Cl. at 662. Indeed, it will almost always be the expectation that the new contract will be an improvement over the old. *Id.* at 663. To allow a best interests determination to rest

on such a common ground would permit the override exception to swallow the Congressionally mandated rule that stays be automatic.  *Id.*; *accord Univ. Research Co. v. United States*, 65 Fed. Cl. 500, 503 (2005).

   We acknowledge that the WHS made a persuasive case for the advantages of the new contract.  But no matter how many manifestations of this assessment appear in the override, it is still only one assessment.  This lone justification cannot stand on its own unless we are to ignore CICA's mandate.  *PGBA*, 57 Fed. Cl. at 661-62; *see also, Cigna Government Serv. v. United States*, 70 Fed. Cl. 100, 102 n.5 (2006) ("Absent the stay, GAO's protest process – an enforcement mechanism for competition in government procurement – can be rendered illusory or 'toothless' if agencies cavalierly invoke best interest overrides and 'extremely tight' schedules just to get on with their procurements.")  There must be some rationale – above and beyond the principle aim originally sought when WHS decided to engage bidders in the competitive procurement – that absolves the agency of its obligation to await the GAO's recommendation.  For instance, in *Spherix*, a case relied upon extensively by Defendant, the unique nature of the program and critical scheduling issues supported the agency's override.  *Spherix*, 62 Fed. Cl. at 506 (noting that "particular program is a Presidential priority, not an ordinary governmental program").  The stay at issue jeopardized the phased-in implementation of a new recreation and reservation program, which required contract performance to begin during non-peak periods.  *Id*.

   Although *Spherix* advocated a lesser showing for "best interests" determinations than for "urgent and compelling circumstances" – an approach with which we disagree – the governmental action in that case nevertheless appears to have been held to a higher standard.  In *Spherix* the override was justified by much more than a brief delay in commencing with the awarded contract.  Similarly, in *Sierra Military Health Services, Inc. v. United States*, 58 Fed. Cl. 573, 581 (2003), the stay would have subjected the agency to prohibitive contract extension costs.  And in *Chapman Law Firm Co. v. United States*, 67 Fed. Cl. 188 (2005), there was the danger that no services at all could be offered during the stay because of an absence of personnel.  *Id*. at 192-93 (Court credited HUD concerns that unmanaged properties would pose financial and public safety risks.)

   In this case, the WHS offers only that the stay will not allow the agency to eliminate the needless and expensive duplication of IT systems as quickly as it wishes.  The D&F cites no specialized and unique consequences of delay beyond this generic desire to get on with the procurement.  Although WHS points to the potential frustration of "efforts to provide a smooth transition to a new service provider," the agency does not back the claim.  D&F at ¶ 9.

   Its concern centers on the available personnel during the transition period.  Defendant raises the specter of an exodus of required specialists.  However, the rationale offered by the Director is internally inconsistent.  In the space of one

paragraph, he asserts "that KENROB can fully staff the job with its own resources" (a statement that *is* supported by the administrative record, see KENROB's Proposal, Transition Plan, AR 645-46), and then also cites the unfounded concern that incumbent workers who might otherwise be interested in accepting employment with KENROB, will be placed in limbo -- "KENROB, with contract performance suspended, cannot hire them."  D&F at ¶ 9.

Of course, many of these incumbent workers that the agency would have transition over to Team KENROB are ASD employees.  So the Director is guilty of much more than contradictory logic; he offers as a justification for lifting the stay the very type of competitive disadvantage that the CICA seeks to prevent.

The agency's interests in avoiding an unscheduled loss of service also do not justify the override.  While loss of service might be a valid concern, unlike the facts in the *Chapman* or *Sierra* cases, here there is no indication in the *original* D&F that IT services will be jeopardized (we will discuss the supplemental findings momentarily).  The WHS fails to explain adequately *why* it cannot obtain the IT services from sources other then KENROB during the period of delay.  For instance, the incumbent contracts apparently could be extended.  However, the WHS chooses not to extend them based solely on their assurance that the old contracts are not as efficient as the new consolidated contract.   D&F at ¶ 8.

Ultimately, each of the proffered reasons for overriding the stay can be traced back to the desire to embark on the newer, better contract.  It is the *preferred* approach, certainly, but there has been no showing that it is a *necessary* approach.  *See e.g.,* D&F at ¶ 10 ("The public interest demands that every effort be made to ensure a smooth transition and delaying implementation of a more streamlined and effective approach to providing IT support would be imprudent.").

Nor does the override determination compare the perceived disadvantages of recognizing the stay to the potential disadvantages that might result if ASD prevails in its protest.  This would make WHS liable for costs incurred by KENROB during the period in which the stay would have been imposed.  *See Chapman Law Firm Co. v. United States*, 62 Fed. Cl. 464, 467-68 (2004); *PGBA*, 57 Fed. Cl. at 662.  There is no discussion of extending or modifying current contracts during the GAO case.  Instead that topic is foreclosed with the following flat assertion:

> The current fragmentation of IT support combines high costs with low performance and represents a poor use of federal funds.  In addition, extending the existing contracts prolongs the problem without the opportunity for mitigation in the interim.  Using six different IT support

> contracts is inherently inefficient and there is nothing short of the
> consolidation of services contemplated by this contract, that can
> make this operation more efficient.

D&F at ¶ 8.

The WHS has apparently read out of CICA any significance to the stay requirement. There is no claim that existing systems might lapse during the delay occasioned by the GAO protest. *See PGBA*, 57 Fed. Cl. at 661. It is not the case, apparently, that there will be no contractors capable of providing interim services. *See Chapman Law Firm*, 67 Fed. Cl. at 191. To the contrary, the D&F recognizes that there are plenty of qualified personnel with valuable knowledge currently working for the incumbent contractor. D&F at ¶ 9. The WHS Director's rationale simply extols the virtues of proceeding with the new contract and ensuring a smooth transition, while ignoring the possibility that the protest may have merit. We conclude that this shortsighted approach is both arbitrary and capricious, and contrary to the objectives of CICA's stay provisions.

Finally, we note that the Defendant effectively conceded at least one of the override's deficiencies in its brief:

> ASD asserts that WHS should have considered the costs to terminate
> KENROB's contract for convenience should its protest be sustained and
> ASD prevail in the re-evaluation. Pl. Mem. at 24-26. Those termination
> costs have *now* been considered by WHS, and weighing the costs and
> inefficiencies associated with continuing under the incumbent regime
> against the termination costs that might be due KENROB should ASD's
> protest be sustained and ASD win the re-evaluation, WHS has concluded
> that the nation is best served by continuing to override the stay. See
> Supplemental Determination and Findings, attached as Exhibit B.
> Accordingly, the Government respectfully submits that the stay override is
> proper and well supported by the record.

Def. Opp. at 23-24 (emphasis added). As it turns out, we are not convinced that the agency did, in fact, consider the full range of consequences in the event of a successful protest by ASD. We address the merits of the supplemental evidence further below.

### *Administrative Record and Consideration of Supplemental Materials*

We review a challenged procurement decision through the prism of the administrative record, under the procedures established by RCFC 52.1 (replaced RCFC 56.1, effective June 20, 2006) for motions for judgment on the administrative record. Because we test the decision under the arbitrary and capricious standard, our review

-11-

should be necessarily confined to "the administrative record already in existence, not some new record made initially in the reviewing court." *Comprehensive Health Serv., Inc. v. United States,* 70 Fed. Cl. 700, 719 (2006) (citations omitted).

As this Court has observed, however, the parties should be permitted, in appropriate cases, to supplement the administrative record, since "in most bid protests, the 'administrative record' is something of a fiction, and certainly cannot be viewed as rigidly as if the agency had made an adjudicative decision on a formal record that is then certified for court review." *Cubic Applications, Inc. v. United States*, 37 Fed. Cl. 345, 350 (Fed. Cl. 1997) (Reviews factors which may support limited discovery or supplementation of the administrative record).  This is true in the "contract award context," perhaps.  *Id.*  However, in the narrow context of statutory compliance with the automatic stay provisions of CICA, it is unnecessary to search beyond the four corners of the override decision – the agency either complied with the requirements of Section 3553(d)(3) of CICA, or it did not.

This case was essentially an unremarkable "override case" until the Government attached its two exhibits to its Opposition Brief, purporting to present for the Court's consideration new material not included in the filed administrative record and, indeed, created five days after the administrative record was filed.  The documents were not accompanied by any motion, nor, inexplicably, did the Government address in its brief the anomalies they presented.  The Government simply assumed the exhibits were part of the decisional record and proceeded to argue their contents.

For the first time at oral argument, counsel for the Defendant "formally" made a motion to supplement the administrative record.  At the conclusion of the Plaintiff's remarks, and before beginning her own presentation, counsel made an oral motion to admit the two exhibits attached to the Government's brief.  Indeed, counsel was somewhat hesitant, suggesting she would make the motion if the Court thought it necessary.  Her request was based, in part, on the argument that RCFC 65 allows extra-record evidence on the issue of relief; that is, outside evidence may be considered to the extent it bears on the question of whether the balance of harms and the public interest support the issuance of injunctive relief.

Counsel suggested that the documents were being offered on the question of relief, and not on the merits of the override.  The Government brief, however, clearly relied on the documents on the question of merits.  In the alternative, the Government argued, the evidence should be permitted to "further explain the WHS Director's original findings."  Transcript of Oral Argument.  According to the Defendant the Court should consider the evidence under the second *Esch* exception.

Counsel's argument is internally inconsistent.  On the one hand, she claims that the proffered exhibits present no new rationale, but rather "provide further details."  Yet she invokes the second factor articulated by the Court of Appeals for the D.C. Circuit in *Esch v. Yeutter*, 876 F.2d 976 (D.C. Cir. 1989).  That case cites a now famous law

review article which summarizes eight instances in which courts are likely to allow the use of extra-record evidence – eight exceptions, if you will, to the general rule that judicial review of agency action is limited to the administrative record:

> (1) when agency action is not adequately explained in the record before the court; (2) *when the agency failed to consider factors which are relevant to its final decision*; (3) when an agency considered evidence which it failed to include in the record; (4) when a case is so complex that a court needs more evidence to enable it to understand the issues clearly; (5) in cases where evidence arising after the agency action shows whether the decision was correct or not; (6) in cases where agencies are sued for a failure to take action; (7) in cases arising under the National Environmental Policy Act; and (8) in cases where relief is at issue, especially at the preliminary injunction stage.

*Id.* at 991 (citing Stark & Wild, *Setting No Records, The Failed Attempts to Limit the Record in Review of Administrative Action*, 36 Admin.L.Rev. 333, 345 (1984) (emphasis added). Of course, the second *Esch* exception, invoked here by Defendant, has nothing to do with providing further explanation or details. Indeed, it is an exception upon which the Government would rarely rely. But to the extent the defendant suggests that its agency "failed to consider factors relevant to its final decision" – some of which appear in the supplementary materials but not in the original D&F – we would agree. And, of course, to the extent that counsel is implicitly conceding the agency's original failure to consider relevant factors, she concedes the merits.

At the hearing, we ruled that the Defendant has waived its opportunity to justify its submission of the exhibits. As a procedural matter, the exhibits attached to Defendant's Opposition Brief are not properly before us. We agree with the Government that extra-record evidence may be considered on the issue of relief, or as the Government termed it the "harm analysis." However, this evidence goes directly to the merits of the agency's decision and whether or not it was reasonable. Though portions of the declaration and the supplemental findings address relief and the balance of hardships, those documents are proffered to demonstrate that the WHS correctly determined that contract suspension is not in the best interests of the Government.

The Plaintiff objected that the Government's exhibits were a thinly veiled attempt to get a second bite at the apple. That came a full two weeks after the first override decision, five days after the filing of the administrative record. The supplemental findings offend the statutory requirements. *See* 48 C.F.R. § 33.104(c)(3) ("Contract performance shall not be authorized until the agency has notified the GAO of the [written "best interests" finding]."). We have been supplied no authority for the proposition that the override determination can be an evolving document. In effect, the Government has executed the override two weeks before it issued its "perfected" Determination and Findings. The text of the statute does not support a reading that the

override can precede the statutory justification. It is our conclusion, therefore, that under principles of administrative review, the validity of the WHS Director's override decision must "stand or fall on the propriety of that finding." *Camp v. Pitts*, 411 U.S. 138, 143 (1973).

Therein lies the fundamental flaw in the way in which the purported supplemental findings are presented to us. The evidence offered by the Government with its responsive pleading is "no more than a litigation position to which no deference is due." *Gose v. U.S. Postal Service*, 451 F.3d 831, 838 (Fed. Cir. 2006) (characterizing agency's after-the-fact interpretation of its own regulation); *see also, ATA Def. Indus., Inc. v. United States*, 38 Fed. Cl. 489, 498-99 (1997), *abrogated on other grounds*, 258 F.3d 1294, 1302 (Fed. Cir. 2001). Given the timing of their submissions, the total absence of any effort to explain or justify the legal significance of its submissions, and the lack of corroborating detail in the administrative record, the WHS, with Mr. Newton's supplemental findings and Mr. Cox' declaration, is "now masquerading a post hoc rationalization as a then-existing 'interpretation'" of its basis for overriding the stay. *Gose,* 451 F.3d at 839 (citing *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156 (1962)); *see also Parker v. OPM*, 974 F.2d 164, 166 (Fed. Cir. 1992) (recognizing risk that agency actions would be based on desire to prevail in litigation rather than to further appropriate agency goals).

Even were we to consider the new justifications for the override, moreover, our view of the WHS determination would not change. For example, the affidavit and the belated supplementation of the override cite for the first time "unforecasted [IT budget] cuts imposed in the middle of the fiscal year." This is an attempt to buttress the case against delaying the consolidation of IT systems in the new contract. Supp. D&F at ¶ 7. We have distressingly little information about these budget cuts – when, for example, were they imposed? Before the original override, perhaps. These are self-imposed concerns, and do not necessarily have any bearing on the question of whether "performance of the contract is in the best interests *of the United States*." 31 U.S.C. § 3553 (d)(3)(C) (emphasis added). Budget cuts are an inevitable vexation for program officers across the spectrum of federal agencies; they are certainly not unique to the Department of Defense or the WHS. *See PGBA*, 57 Fed. Cl. at 663 ("[CICA] does not allow the agency to override the stay when it is in the best interests of that agency or the agency's contracting officials. Rather, the best interests of the 'United States' must be involved and those interests necessarily include weighing the benefits Congress obviously felt were furthered by bolstering the bid protest process and, in turn, promoting competition in contracting.").

The July 5 supplemental findings for the first time establish a dollar figure for the purported economic advantages of the consolidated contract. According to those findings:

> The direct costs savings, $462,054 per month, reaped by WHS through performance of the consolidated contract during the override period pending GAO's decision and, if necessary, the time required to reevaluate the proposals, significantly outweighs the potential termination for convenience costs. This net positive cost savings coupled with the enhanced performance benefits for the IT systems supporting the Secretary of Defense and other Pentagon-based agencies make it in the nation's best interests to continue contract performance pending the ASD protest.

Suppl. D&F at ¶ 5. Though certainly an improvement over the vague rationale of the override determination, the supplemental findings still do not establish a unique need for immediate performance. We would reject the purported $462,000 in cost-savings as only a variant on the "new is better" justification.

Quite apart from the procedural and legal infirmities of this after-the-fact expansion of the original justification, we have problems with the math. First, as Plaintiff points out, the calculation of the monthly savings of $462,000 is based on facts not found in the administrative record – that is, the cost of the individual contracts. The agency's projected costs of re-transition, in the event of a successful protest, are between $28,000 and $58,000. This wide-ranging figure is also not explained or referenced in the administrative record; we have only the conclusory statements of Mr. Cox in a single paragraph of his declaration. Cox Decl. at ¶ 14. In contrast, there is no figure provided for the projected contract termination costs. In estimating the potential cost of an override in the event the GAO protest is successful -- and the KENROB contract is necessarily terminated for the convenience of the Government – WHS must calculate the exposure to compensate KENROB. As in the *PBGA* case, "[t]he Director made no effort to quantify these costs," thereby downplaying "a variable that should have been an important aspect of his cost evaluation calculus." *PGBA*, 57 Fed. Cl. at 662 (citing legislative history, H.R. Conf. Rep. No. 98-861 at 1436, U.S. Code Cong. & Admin. News 1984, pp. 697, 1080-81.); *see Cigna*, 70 Fed. Cl. at 111 (Agency failed to articulate costs of "recompeting these contracts and redoing the activities it is now conducting with potentially different vendors in the event a GAO-ordered reevaluation were to change the results.").

Plaintiff argues that KENROB's early costs of performance will be significant, including the installation of a so-called Enterprise Management Tool Suite at a cost of just under [$]. Counsel assured the Court during oral argument that this potential liability was actually considered by the agency and factored into its cost analysis. We have been pointed to no evidence supporting this thesis, however. Nor is there any evidence the agency included this near million dollar exposure as a potential liability in a termination for convenience. Accordingly, it fails administrative review . *See Cygnus Corp., Inc. v. United States, et al.*, Case No. 05-1313C, slip. op. at 8 (Fed. Cl. July 13, 2006) ("[W]hen an agency cites cost savings as a justification ... the

-15-

facts supporting this justification must be borne out in the administrative record.") (citing *Great Lakes Dredge & Dock Co. v. United States*, 60 Fed. Cl. 350, 358 (2004)).

### *Entitlement to Declaratory and Injunctive Relief*

In deciding bid protests, we deal with the familiar burdens required for litigants seeking extraordinary relief.  In particular, a party moving for injunctive relief, whether a preliminary or permanent injunction, must show: (1) success (or in the case of a preliminary injunction, a substantial likelihood of success) on the merits; (2) that the plaintiff will suffer irreparable harm if the Court does not grant an injunction; (3) that the balance of hardships to the respective parties favors granting the injunction; and (4) that it is in the public interest to grant injunctive relief.  *PGBA, LLC v. United States*, 389 F.3d 1219, 1228-29 (Fed. Cir. 2004) (citing *Amoco Prod. Co. v. Vill. of Gambill, Alaska*, 480 U.S. 531, 546 n.12 (1987)).  A motion for declaratory judgment, on the other hand, does not require the movant to demonstrate irreparable harm.  *PGBA*, 389 F.3d at 1228 n.6 (citations omitted).

Bid protests are generally brought before the Court on motions for preliminary injunction or on motions for a temporary restraining order.  As a rule, when applying the four factors for injunctive relief, no single factor is dispositive and an inadequate showing regarding one factor may be overcome by the strength of the other factors. *FMC Corp. v. United States*, 3 F.3d 424, 427 (Fed. Cir. 1993); *PGBA*, 57 Fed. Cl. at 656.  There is, however, support for the theory that none of these requirements for injunctive relief applies to protests concerning a CICA override determination.  Senior Judge Merow explains his analysis thusly:

> If, as here, the agency override determination is, after application of the review standard prescribed by 28 U.S.C. § 1491(b)(4), determined to lack validity, declaratory relief so ruling serves to reinstate the statutory stay of contract performance, during the GAO protest period automatically provided under 31 U.S.C. § 3553(d)(3)(A).  Congress did not require any evaluation of injunctive relief factors as a prerequisite to a stay of contract performance upon the filing of a protest with the GAO.  Thus, it would be contrary to the legislative scheme to impose such an additional requirement, upon finding that an agency override determination lack  [sic] validity, in order to reinstate the statutory stay applicable during the GAO protest period.  Declaratory relief preserves the scheme that Congress enacted.

*Chapman Law Firm Co. v. United States*, 65 Fed. Cl. 422, 424 (2005).  There does seem to be some incongruity in forcing a plaintiff to meet the high burden necessary for obtaining extraordinary relief, when the statute gives presumptive weight to the otherwise required showings of irreparable harm and public interest.

Judge Williams recognizes the same rule for reasons of practicality and efficiency:

> Because the declaratory judgment will reinstate the stay and vacate the override, having the same effect as an injunction, the Court does not reach the issue of injunctive relief. In so ruling, the Court has taken into account the necessity of resolving this matter expeditiously recognizing that each day that passes prolongs the time when the stay is not in effect.

*Cigna*, 70 Fed. Cl. at 114.

We adopt this approach, as well. Thus, despite the fact that Plaintiff requests an injunction, we find that a declaratory judgment achieves the same effect. By concluding, as we do, that the agency's CICA override lacks a rational basis and is contrary to law, we return the parties to the *status quo ante* – the automatic stay of performance is necessarily restored. In accordance with CICA, the WHS cannot proceed with KENROB's performance of this contract. And by virtue of this ruling, the agency may not base some hypothetical future override on the reasons articulated in this litigation (Counsel for the United States conceded during oral argument that the practical effect of a declaratory judgment in Plaintiff's favor meant that any future override determination must allege new reasons.).

## **CONCLUSION**

Based on the foregoing reasons, we conclude that the determination to override the automatic stay imposed under CICA lacks a rational basis and is contrary to law. Accordingly, the WHS determination and findings, dated June 21, 2006, and supplemental determination and findings, dated July 5, 2006, are set aside. By operation of law, the automatic stay in Plaintiff's GAO protest is reinstated.

Plaintiff's motion for declaratory judgment is hereby **GRANTED**. Plaintiff's motion for a preliminary injunction is **DENIED** as moot.

IT IS SO ORDERED.

      s/ Lawrence M. Baskir  
      LAWRENCE M. BASKIR  
      Judge